607 A.2d 1298

MIRIAM ZIEGELHEIM, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. STEPHEN APOLLO, INDIVIDUALLY AND STEPHEN APOLLO, A PROFESSIONAL CORPORATION, DEFENDANTS–APPELLANTS AND CROSS–RESPONDENTS.

Argued February 3, 1992—Decided June 23, 1992.

*James P. Anelli* argued the cause for appellants and cross-respondents (*Friedman Siegelbaum,* attorneys; *James P. Anelli* and *Mark C. Maniscalco,* on the briefs).

*Robert A. Baron* argued the cause for respondent and cross-appellant (*Baron & Baron,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

In this case we must decide what duties an attorney owes a client when negotiating a settlement and whether a client's agreement to a negotiated settlement bars her from recovering from her attorney for the negligent handling of her case.

I

Miriam Ziegelheim, plaintiff, and Irwin Ziegelheim were married on September 11, 1955, and were divorced by a final decree dated August 5, 1983. During the early years of their marriage, Mrs. Ziegelheim was gainfully employed, assisting her husband in his business ventures and working for other employers as well. After the Ziegelheims adopted two infant sons she became a full-time homemaker. The couple separated in August 1979.

In September 1979, Mrs. Ziegelheim retained defendant, attorney Stephen Apollo, to represent her in her anticipated divorce action. Because this appeal relates to the trial court's granting of summary judgment against plaintiff, we assume for the purposes of our decision that all of the facts she alleges relating to Apollo's handling of her divorce are true. According to Mrs. Ziegelheim, she and Apollo met on several occasions to plan various aspects of her case. She told him about all of the marital and separate assets of which she was aware, and they discussed her suspicion the Mr. Ziegelheim was either concealing or dissipating certain other assets as well. In particular, Mrs. Ziegelheim told Apollo that she thought her husband had $500,000 hidden in the form of cash savings and bonds. Accordingly, she asked Apollo to make a thorough inquiry into her husband's assets, including cash, bonds, patents, stocks, pensions, life insurance, profit-sharing plans, and real estate.

When Mrs. Ziegelheim contacted Apollo, she also was aware of a tax deficiency that had been assessed by the Internal Revenue Service against the Ziegelheims on their joint returns. She specifically advised Apollo of her desire that any property settlement agreement absolve her of responsibility for the deficiency. She also insisted that the divorce end with her retention of the marital home, free and clear, with Mr. Ziegelheim assuming the mortgage; that she be awarded $45,630 per year in alimony (with adjustments for inflation); and that Mr. Ziegelheim obtain a life insurance policy in the amount of $500,000 to secure payment of alimony.

In September 1990, Irwin Ziegelheim filed for divorce in the Superior Court, Chancery Division. Through Apollo, Mrs. Ziegelheim filed her answer and a counterclaim. Because both Mr. and Mrs. Ziegelheim sought to terminate their marriage, the only issues to be resolved at the consolidated trial were the payment of alimony, the identification of the marital property, and the equitable distribution of that property.

According to Mrs. Ziegelheim, Apollo failed to discover important information about her husband's assets before entering into settlement negotiations with Mr. Ziegelheim's attorney, Sheldon Liebowitz. Apollo hired an accountant who valued the marital estate at approximately $2,413,000. Mrs. Ziegelheim claims that the accountant substantially underestimated the estate because of several oversights by Apollo, including his failure to locate a bank vault owned by Mr. Ziegelheim; to locate or determine the value of his tax-free municipal bonds; to verify the value of his profit-sharing plan at Pilot Woodworking, a company in which he was the primary shareholder; to search for an estimated $500,000 in savings; to contact the United States Patent Office to verify the existence of certain patents he held; to inquire into a $1,000,000 life insurance policy naming an associate of his as the beneficiary; to verify the value of certain lake-front property; and to verify the value of his stock holdings. She alleges that had Apollo made a proper inquiry, it would have been apparent that the marital

estate was worth approximately $2,562,000, or about $149,000 more than the accountant found.

On November 4, 1982, Apollo, Mrs. Ziegelheim, and her accountant commenced settlement discussions with Liebowitz, Mr. Ziegelheim, and Mr. Ziegelheim's accountant. Several proposals and counter-proposals were made over several days, and the discussions culminated on November 8, 1982, when the parties entered into a property settlement agreement governing distribution of the marital estate as well as arrangements for payment of alimony. Later that day, the agreement was orally entered into the record before the judge presiding over the divorce action. Liebowitz recited to the court what he understood to be the terms of the settlement, asking Apollo to interrupt if the recitation contained any errors. Apollo never interrupted to indicate that he thought Liebowitz's representations were inaccurate. Under the agreement, Mrs. Ziegelheim was granted alimony for fifteen years, totalling approximately $330,000 and averaging approximately $22,000 per year. Mrs. Ziegelheim received the marital home and Mr. Ziegelheim received the couple's lake house. (The parties subsequently disagreed over which of them was to assume the mortgage on the marital home; two transcripts of the hearing differed on the point. The conflict was resolved at a subsequent hearing, in which the court determined that audio recordings of Liebowitz's recitation revealed that Mrs. Ziegelheim was to assume the mortgage.) The Ziegelheim's other personal property also was allocated between them. Mrs. Ziegelheim received shares in Pilot Woodworking, which the company would redeem according to a set schedule, and Mr. Ziegelheim promised to contribute $400 per year toward the purchase of a life term insurance policy. Mr. Ziegelheim also agreed to indemnify Mrs. Ziegelheim for any tax liabilities incurred for the years 1979, 1980, and 1981 "except for liabilities created by Mrs. Ziegelheim." In sum, Mrs. Ziegelheim was to receive approximately $333,000 in alimony, $6,000 in contributions to insurance costs, and $324,-000 in property, the last figure representing approximately

fourteen percent of the value of the estate (as appraised by Apollo and the accountant). Mr. Ziegelheim was to receive approximately $2,088,000 in property, approximately eighty-six percent of the value of the estate.

When testifying before the court immediately after the settlement was read into the record, both Mrs. Ziegelheim and Mr. Ziegelheim stated that they understood the agreement, that they thought it was fair, and that they entered into it voluntarily. Mrs. Ziegelheim now asserts, however, that she accepted the agreement only after Apollo advised her that wives could expect to receive no more than ten to twenty percent of the marital estate if they went to trial. She claims that Apollo's estimate was unduly pessimistic and did not comport with the advice that a reasonably competent attorney would have given under the circumstances. Had she been advised competently, she says, she would not have accepted the settlement.

The settlement was not finalized until August 2, 1983. According to Mrs. Ziegelheim, the written agreement failed to conform with the oral agreement in that it did not indemnify her for tax deficiencies for which she claims her former husband was wholly responsible. She also claims that the nine-month delay in putting the agreement into final written form was unnecessary, and that it caused her to lose one year's interest on the first $75,000 owed to her pursuant to the stock-redemption clause.

In 1984, Mrs. Ziegelheim filed a malpractice action against Apollo and contemporaneously sought to reopen the divorce decree and set aside the property settlement. While the motion to set aside the settlement was pending, the malpractice action was called to trial. Because the malpractice action was premature in the absence of a ruling on the motion to reopen the divorce decree, she voluntarily dismissed the action against Apollo in April 1987 and subsequently filed a second malpractice claim against him. The family court denied her motion to set aside the settlement agreement, concluding that the record

demonstrated that "both plaintiff and defendant unequivocally accepted the agreement and felt that it was fair." In July 1988, the Appellate Division affirmed, stating that the parties had "entered into settlement after extensive negotiations" and that "defendant unequivocally stated that she accepted the settlement without coercion." As a result of that decision, Mrs. Ziegelheim was left only with her case against Apollo, the case before us now.

Mrs. Ziegelheim filed a five-count complaint against Apollo. Under the first count, she alleged that he was negligent in handling her case because he delayed in securing a final written settlement and thereby caused her to lose interest on the payments due under the settlement; because the written settlement did not contain the tax indemnification clause she wanted; and because the written settlement did not require Mr. Ziegelheim to make as large a contribution to the life insurance costs as she wanted. In the second and third counts she alleged that defendant was negligent in handling her case because he permitted it to settle for less than it should have. In the fourth count she alleged that defendant was negligent in handling her case because he permitted the case to settle under circumstances that ensured an unfair outcome; because he failed to use proper procedures in preparing and negotiating the case; and because he convinced her to accept an agreement that a reasonably prudent attorney would have advised against accepting. In the fifth count she alleged that he was negligent in handling her case because he failed to reduce the complex settlement proposal to writing, compromising her ability to understand its terms and to give informed and reasoned consent to them.

Apollo moved for summary judgment. Each side relied on reports prepared for them by outside experts in support of their respective positions, although neither side's report was formally entered into evidence. (Nevertheless, the report of Mrs. Ziegelheim's expert was included in her appendix filed with the Appellate Division, which referred to it in its disposition of the case.) During her deposition, Mrs. Ziegelheim asserted that

Apollo had told her that she could expect to receive no more than twenty percent of the marital estate if she took her case to trial. Her statement was quoted in her expert's report. Although neither side's report was admitted into evidence, and although Apollo denied making the statement attributed to him, Apollo assumed for the purpose of assessing his motion for summary judgment that he had told Mrs. Ziegelheim that the settlement agreement represented the most that she would receive if the matter were tried.

The trial court ruled in favor of defendant on all counts. It noted that Mrs. Ziegelheim had stated on the record that she understood the settlement and its terms, that she thought the terms were fair, and that she had not been coerced into settling. With respect to her claims relating to the life insurance policy and the tax indemnification, the court found that Apollo could not be faulted for a failure to persuade an adversary to agree to the terms his client desired. Similarly, with respect to her claim that Apollo unnecessarily delayed in the execution of the agreement, the court observed that it can take considerable time to complete written settlements, and that the record revealed that Apollo made an effort to have the agreement executed in a timely fashion. With respect to her claim that Apollo failed to investigate her case properly, the court ruled that her claim was precluded by the findings that the Chancery Division, Family Part, made when she attempted to re-open the settlement itself. Noting that the family court had found no evidence of concealed assets, the trial court ruled that Apollo could not be faulted for his failure to discover concealed assets that did not exist.

On the subject of Apollo's controversial opinion relating to the probability that Mrs. Ziegelheim would receive a more favorable disposition if her case went to trial, the court stated:

It is well established in New Jersey that an attorney is not a guarantor of his opinions and could not be held liable for giving an opinion about a settlement. *Procenik [Procanik ] v. Cillo*, 226 *N.J.Super.* 132, 154 [543 *A.*2d 985] (App.Div. 1988); *St. Pius X House of Retreats v. Camden Dio[cese]*, 88 *N.J.* 571, 588 [443

A.2d 1052] (1932). An attorney is not an insurer, he's not a guarantor of the soundness of his opinions of success of the outcome of the litigation in which he's employed to conduct. He's not answerable for error of judgment in the conduct of the case or for every mistake which may occur in practice. *McCullough v. Sullivan*, 102 *N.J.L.* 381, 384 [132 *A.* 102] (E. [&] A. 1926).

In the present case, Mrs. Ziegelheim voluntarily entered into the settlement agreement. She stated on the record that she understood the settlement and its terms, that she thought the settlement in all its terms were just, and that she was not coerced into settling. She also stated she understood she could try the matter if so desired.

With these statements on the record, the plaintiff could not now, in hindsight, bring an action against her former attorney because she's unhappy with the terms of the settlement. Plaintiff participated in the settlement negotiation and represented to the Court she understood the terms and was not coerced into settling.

While it is true that Mr. Apollo may have advised differently than another attorney, this does not give rise to legal malpractice. Different attorneys will give differing opinions. That is with [sic] the law protects an attorney when he gives an opinion.

The Appellate Division affirmed the trial court with respect to all claims except the claim under count four in which Mrs. Ziegelheim alleged that defendant was negligent in handling her case because he convinced her to accept an agreement that a reasonably prudent attorney would have advised against accepting.

Cross-petitions for certification were granted. 126 *N.J.* 390, 599 *A.*2d 166 (1991).

II

 Like most professionals, lawyers owe a duty to their clients to provide their services with reasonable knowledge, skill, and diligence. *St. Pius X House of Retreats v. Diocese of Camden*, 88 *N.J.* 571, 588, 443 *A.*2d 1052 (1982). We have consistently recited that command in rather broad terms, for lawyers' duties in specific cases vary with the circumstances presented. "What constitutes a reasonable degree of care is not to be considered in a vacuum but with reference to the type of service the attorney undertakes to perform." *Id.* at 588, 443 *A.*2d 1052. The lawyer must take "any steps necessary in the

proper handling of the case." *Passanante v. Yormark*, 138 *N.J.Super.* 233, 239, 350 *A.*2d 497 (1975). Those steps will include, among other things, a careful investigation of the facts of the matter, the formulation of a legal strategy, the filing of appropriate papers, and the maintenance of communication with the client. *Id.* at 238–39, 350 *A.*2d 497.

In accepting a case, the lawyer agrees to pursue the goals of the client to the extent the law permits, even when the lawyer believes that the client's desires are unwise or ill-considered. *Lieberman v. Employers Ins. of Wausau*, 84 *N.J.* 325, 340, 419 *A.*2d 417 (1980). At the same time, because the client's desires may be influenced in large measure by the advice the lawyer provides, the lawyer is obligated to give the client reasonable advice. As a legal matter progresses and circumstances change, the wishes of the client may change as well. Accordingly, the lawyer is obligated to keep the client informed of the status of the matter for which the lawyer has been retained, and is required to advise the client on the various legal and strategic issues that arise. *In re Yetman*, 113 *N.J.* 556, 563, 552 *A.*2d 121 (1989); *Lieberman, supra*, 84 *N.J.* at 340, 419 *A.*2d 417; *In re Loring*, 73 *N.J.* 282, 290, 374 *A.*2d 466 (1977).

In this case, Mrs. Ziegelheim made several claims impugning Apollo's handling of her divorce, and the trial court dismissed all of them on Apollo's motion for summary judgment. As we explain, we believe that the trial court's rulings on several of her claims were erroneous.

In legal malpractice cases, as in other cases, summary disposition is appropriate only when there is no genuine dispute of material fact. *Judson v. Peoples Bank & Trust Co.*, 17 *N.J.* 67, 74, 110 *A.*2d 24 (1954). A litigant has a right to proceed to trial "where there is the slightest doubt as to the facts." *Ruvolo v. American Casualty Co.*, 39 *N.J.* 490, 499, 189 *A.*2d 204 (1963). All inferences are drawn in favor of the party

opposing the motion for summary judgment. *Judson, supra,* 17 *N.J.* at 75, 110 *A.*2d 24.

On Mrs. Ziegelheim's claim that Apollo negligently advised her with respect to her chances of winning a greater proportion of the marital estate if she proceeded to trial, we conclude, as did the Appellate Division, that there was a genuine dispute regarding the appropriate advice that an attorney should give in cases like hers. According to the expert retained by Mrs. Ziegelheim, women in her position—who are in relatively poor health, have little earning capacity, and have been wholly dependent on their husbands—often receive upwards of fifty percent of the marital estate. The expert said that Mrs. Ziegelheim's chances of winning such a large fraction of the estate had she gone to trial would have been especially good because the couple had enjoyed a high standard of living while they were together and because her husband's earning capacity was "tremendous" and would remain so for some time. Her expert's opinion was brought to the trial court's attention, as was the expert report of Mr. Ziegelheim. If plaintiff's expert's opinion were credited, as it should have been for purposes of summary judgment, then Apollo very well could have been found negligent in advising her that she could expect to win only ten to twenty percent of the marital estate.

Apollo urges us to adopt the rule enunciated by the Pennsylvania Supreme Court in *Muhammad v. Strassburger, McKenna, Messer, Shilobod and Gutnick,* 526 *Pa.* 541, 587 *A.*2d 1346 (1991), that a dissatisfied litigant may not recover from his or her attorney for malpractice in negotiating a settlement that the litigant has accepted unless the litigant can prove actual fraud on the part of the attorney. Under that rule, no cause of action can be made based on negligence or contract principles against an attorney for malpractice in negotiating a settlement. The Pennsylvania Supreme Court rationalized its severe rule by explaining that it had a "longstanding

public policy which encourages settlements." *Id.,* 587 *A.*2d at 1348.

New Jersey, too, has a longstanding policy that encourages settlements, but we reject the rule espoused by the Pennsylvania Supreme Court. Although we encourage settlements, we recognize that litigants rely heavily on the professional advice of counsel when they decide whether to accept or reject offers of settlement, and we insist that the lawyers of our state advise clients with respect to settlements with the same skill, knowledge, and diligence with which they pursue all other legal tasks. Attorneys are supposed to know the likelihood of success for the types of cases they handle and they are supposed to know the range of possible awards in those cases.

As we noted in *Levine v. Wiss & Co,* 97 *N.J.* 242, 246, 478 *A.*2d 397 (1984), "One who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession in good standing in similar communities." We have found in cases involving a great variety of professionals that deviation from accepted standards of professional care will result in liability for negligence. Professionals subject to that rule include doctors, *e.g., Betenbaugh v. Princeton Hospital,* 50 *N.J.* 390, 235 *A.*2d 889 (1967); dentists, *e.g., Sanzari v. Rosenfeld,* 34 *N.J.* 128, 167 *A.*2d 625 (1961); chiropractors, *e.g., Rosenberg by Rosenberg v. Cahill,* 99 *N.J.* 318, 492 *A.*2d 371 (1985); pharmacists, *e.g., In re Suspension of Heller,* 73 *N.J.* 292, 374 *A.*2d 1191 (1977); insurance brokers, *e.g., Milliken v. Woodward,* 64 *N.J.L.* 444, 45 *A.* 796 (Sup.Ct.1900); and accountants, *e.g., Levine, supra,* 97 *N.J.* at 246, 478 *A.*2d 397. Lawyers are clearly included as well, *e.g., St. Pius X House of Retreats, supra,* 88 *N.J.* 571, 443 *A.*2d 1052; *Lieberman, supra,* 84 *N.J.* 325, 419 *A.*2d 417; *Passanante, supra,* 138 *N.J.Super.* 233, 350 *A.*2d 497. Like most courts, we see no reason to apply a more lenient rule to lawyers who negotiate settlements. *See, e.g., Helmbrecht v. St. Paul Insurance Co.,* 122 *Wis.*2d 94, 362 *N.W.*2d 118 (1985); *Segall v. Berkson,* 139

*Ill.App.*3d 325, 93 *Ill.Dec.* 927, 487 *N.E.*2d 752 (1985); *Rhine v. Haley,* 238 *Ark.* 72, 378 *S.W.*2d 655 (1964); *Ishmael v. Millington,* 241 *Cal.App.*2d 520, 50 *Cal.Rptr.* 592 (1966). After all, the negotiation of settlements is one of the most basic and most frequently undertaken tasks that lawyers perform.

 Apollo argues that the Appellate Division inappropriately considered the report prepared by Mrs. Ziegelheim's expert when it reversed the trial court's judgment. As noted, both parties produced expert reports at the trial level. The status of the reports is unclear. We should state as a preliminary matter that had the court not considered the conflicting factual contentions contained within the parties' reports, the court would have been in error to rule against the plaintiff on the basis of an incomplete record. A trial court should consider all of the information it knows to be available when evaluating claims for summary judgment. It should assure itself that the parties have had a reasonable opportunity to obtain and submit material information to the court, and, in appropriate circumstances, it should insist on the presentation of such evidence. *See Sholtis v. American Cyanamid Co.,* 238 *N.J.Super.* 8, 19, 568 *A.*2d 1196 (App.Div.1989). The record in this case makes plain, however, that the trial court was in fact aware of the basic point of Mrs. Ziegelheim's expert's report, even though the court did not examine the report closely. The trial court's opinion reveals that summary judgment was awarded to Apollo notwithstanding plaintiff's contention, supported by specific factual allegations, that Apollo rendered improper advice. Moreover, Apollo's lawyer had informed the court that the defense, too, had secured an expert's report. In admitting that, the defense virtually conceded that there was a genuine dispute over the propriety of Apollo's advice. Summary judgment should not be granted when the moving party demonstrates through *its own* submissions that there is a genuine dispute over material fact, regardless of the presence or absence of submissions by the opposing party. *Judson, supra,* 17 *N.J.* at 75, 110 *A.*2d 24.

Although the Appellate Division reversed the trial court on Mrs. Ziegelheim's claim relating to Apollo's advice, it affirmed the trial court on all other claims. On the issue of Apollo's alleged failure to make a proper investigation into Mr. Ziegelheim's assets, the trial court ruled that litigation on that issue was precluded by the family court's determination that the settlement was fair and equitable. We conclude that the family court's determination should not have barred Mrs. Ziegelheim from litigating that claim.

The doctrine of issue preclusion, or collateral estoppel, "bars relitigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action." *State v. Gonzalez,* 75 *N.J.* 181, 186, 380 *A.*2d 1128 (1977). In this case, Apollo argues that the doctrine was applied properly to Mrs. Ziegelheim's claims, even though Apollo himself was not a party to the prior litigation, because *she* was a party to the prior litigation, and her allegations that the agreement was unfair and that Mr. Ziegelheim had concealed certain assets were fully and fairly litigated in that case. It is true that we no longer limit application of issue preclusion doctrine exclusively to cases in which both parties were involved in the prior proceeding, and that we no longer impose an ironclad "mutuality" requirement for application of the doctrine. *Id.* at 188–91, 380 *A.*2d 1128. The doctrine may be applied in certain circumstances against a party even when it could not be applied against the party seeking its application. *Ibid.* Even so, we do not believe that the doctrine should have been applied in this case.

The fact that a party received a settlement that was "fair and equitable" does not mean necessarily that the party's attorney was competent or that the party would not have received a more favorable settlement had the party's incompetent attorney been competent. Thus, in this case, notwithstanding the family court's decision, Mrs. Ziegelheim still may proceed against Apollo in her negligence action.

Moreover, another aspect of the alleged professional incompetence that led to the improvident acceptance of the settlement was the attorney's own failure to discover hidden marital assets. When Mrs. Ziegelheim sought to reopen her divorce settlement, the family court denied her motion with the observation that "[a]mple opportunity existed for full discovery," and that "the parties had their own accountants as well as counsel." The court did not determine definitively that Mr. Ziegelheim had hidden no assets, but stated instead that it "suspected that everything to be known was known to the parties." The earlier ruling did not implicate the competence of counsel and, indeed, was premised on the presumptive competence of counsel. Hence, defendant cannot invoke that ruling now to bar a challenge to his competence. Mrs. Ziegelheim should have been allowed to prove that Apollo negligently failed to discover certain assets concealed by her former husband.

The Appellate Division also affirmed the trial court's dismissal of Mrs. Ziegelheim's claims that Apollo negligently delayed in finalizing the settlement and that the written settlement differed from the one recited by Mr. Ziegelheim's lawyer. Again we conclude that she should have been allowed to litigate those claims on the merits. To be sure, lawyers generally cannot be held liable for their failure to persuade opposing parties to agree to terms, but Mrs. Ziegelheim alleges here that the two sides had agreed to terms and that Apollo simply failed to see to it that the terms were put into writing. Apollo may be able to refute her factual account, but he should not have prevailed on summary judgment, for there were genuine disputes concerning the accuracy of the written version and the reason for the nine month delay in finalizing it.

Mrs. Ziegelheim's final claim is that Apollo was negligent in not writing down the terms of the settlement prior to the hearing in which the settlement was recited and approved by her and Mr. Ziegelheim. She asserts that a competent attorney would have written them down so that she could

review them and make an informed and reasoned assessment of their fairness. At trial she may be able to prove that she would not have accepted the settlement offer had it been presented to her in writing for her review. She may be able to demonstrate, for example, that Apollo's oral presentation of the settlement obscured the fact that it did not include the tax and insurance provisions she desired. We cannot determine the merits of those allegations and decline to speculate on defendant's possible refutation of them. We simply observe that on this record, her final claim, too, presents genuine issues of material fact and should not have been resolved on summary judgment.

In holding as we do today, we do not open the door to malpractice suits by any and every dissatisfied party to a settlement. Many such claims could be averted if settlements were explained as a matter of record in open court in proceedings reflecting the understanding and assent of the parties. Further, plaintiffs must allege particular facts in support of their claims of attorney incompetence and may not litigate complaints containing mere generalized assertions of malpractice. We are mindful that attorneys cannot be held liable simply because they are not successful in persuading an opposing party to accept certain terms. Similarly, we acknowledge that attorneys who pursue reasonable strategies in handling their cases and who render reasonable advice to their clients cannot be held liable for the failure of their strategies or for any unprofitable outcomes that result because their clients took their advice. The law demands that attorneys handle their cases with knowledge, skill, and diligence, but it does not demand that they be perfect or infallible, and it does not demand that they always secure optimum outcomes for their clients.

### III

The judgement of the Appellate Division is affirmed in part and reversed in part and the matter is remanded in accordance with this opinion.

CLIFFORD, J., dissenting in part.

I take to be settled, beyond the necessity for citation of authority, the proposition that to establish a *prima facie* case of legal malpractice a plaintiff must demonstrate that the defendant lawyer failed to meet the standard of professional performance in the legal community, thereby causing loss or damage to the plaintiff. Equally well established is the requirement for expert testimony to demonstrate both the standard and the defendant's deviation therefrom. In this case plaintiff submitted no expert report on defendant's motion for summary judgment; therefore the trial court granted the motion—correctly, in my view.

That both parties had experts' reports in their hip pockets and that the trial court may have been aware of those reports is of no moment. Plaintiff did not even mark her expert's report for identification, never mind in evidence. In fact, the report is before us only because plaintiff's attorney included it—wholly improperly, without leave of court—in the record submitted to the Appellate Division. To declare, as the Court does, *ante* at 264, 607 *A.*2d at 1304, that "[t]he status of the reports is unclear" and that both parties "produced expert reports at the trial level" is to take with the record liberties that can be characterized generously only as "unwarranted." In the pithy expression of Alfred E. Smith, commenting in 1936 on Franklin D. Roosevelt's presidency, "baloney" is what it is (as in: "No matter how you slice it, it's still baloney." Gorton Carruth & Eugene Ehrlich, *The Harper Book of American Quotations* § 187.136 (1988). (That Gov. Smith's position did not represent the majority view either has not escaped my attention.) And while I am still in this now-meandering parenthesis, I think the occasional resort to slang in our judicial opinions does not sully them, for slang, according to no less a literary figure than Carl Sandburg, is "a language that rolls up its sleeves, spits on its hands and goes to work." Laurence J. Peter, *Peter's Quotations, Ideas for Our Time* 284 (1987)). To suggest, as the Court does, *ante* at 264, 607 *A.*2d at 1305, that the trial court

"did not examine the report closely" is to ascend to new heights of flummery. The trial court never even saw the report, much less "examined" it. And so plaintiff's submissions of proof were simply not sufficient to withstand defendant's motion for summary judgment.

A final note. I agree entirely with the Court that a party's expression of satisfaction with the terms of the settlement of a matrimonial action does not end the matter—that is, standing alone it does not constitute an absolute bar to a malpractice action against the lawyer. But I am unwilling to bend the sensible structure of our summary-judgment jurisprudence by substituting for our review a new record that goes beyond the "settlement" issue and then to decide the case on that record rather than on the one created at trial.

I dissent from so much of the Court's judgment as affirms the Appellate Division's reversal of summary judgment on Count Four.

Justice GARIBALDI joins in this opinion.

*For affirmance in part, reversal in part and remandment*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN and STEIN—5.

*For reversal and remandment*—Justices CLIFFORD and GARIBALDI—2.