

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-29-1996

# Wassall v. DeCaro

Precedential or Non-Precedential:

Docket 95-3531

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Wassall v. DeCaro" (1996). *1996 Decisions.* Paper 127.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/127

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

No. 95-3531


DONALD B. WASSALL; POPULIST PARTY NATIONAL COMMITTEE;
JEFF WILKERSON; BILL CHANDLER; PHIL CHESLER; RUSS HUNT;
THE POPULIST OBSERVER; TOM PARKER

                                        Appellees


                              V.


JEFFREY R. DECARO; O'MALLEY & MILES; DECARO, DORAN,
      SICILIANO, GALLAGHER, SONNTAG & DEBLASIS

      DONALD B. WASSALL, POPULIST PARTY NATIONAL COMMITTEE;
      BILL CHANDLER; PHIL CHESLER, RUSS HUNT; THE POPULIST
                OBSERVER and TOM PARKER,

                                        Appellants



On Appeal from the United States District Court
   for the Western District of Pennsylvania
          (D.C. Civil No. 94-00766)



Argued April 24, 1996

Before: BECKER, NYGAARD & LEWIS, Circuit Judges

(Opinion Filed July 29, 1996)


                        Donald B. Wassall (Argued)
                        3154 Cheltenham Court
                        Gibsonia, PA 15044
                        Attorney for Appellants


                        James A. Wood
                        Marianne C. Plant (Argued)
                        Israel, Wood & Puntil
                        310 Grant Street
                        Suite 501
                        Pittsburgh, PA 15219

                        Attorneys for Appellees
                        Jeffrey R. DeCaro
                        DeCaro, Doran, Siciliano,
                        Gallagher, Sonntag &

DeBlasis

R. Bruce Morrison
Marshall, Dennehey,
                                    Warner, Coleman &
Goggin                                      1845 Walnut
Street
                              Philadelphia, PA 19103
                              Scott G. Dunlop
                              Marshall, Dennehey,
Warner, Coleman & Goggin
                                600 Grant Street
                              2900 USX Tower
                              Pittsburgh, PA 15219

                              Attorneys for Appellee
                              O'Malley & Miles

                    OPINION OF THE COURT


NYGAARD, Circuit Judge.
        In this diversity action alleging legal malpractice, the
Populist Party, its Executive Director and National Chairman,
Donald P. Wassall, various other Executive Committee Members, and
the Populist Observer ("plaintiffs") sue their former attorney,
Jeffrey R. DeCaro, and the two law firms at which DeCaro
practiced law while representing plaintiffs ("malpractice
defendants").  The district court granted summary judgment for
malpractice defendants, interpreting the Pennsylvania Supreme
Court case Muhammad v. Strassburger, McKenna, Messer, Shilobod &
Gutnick, 587 A.2d 1346 (Pa.), cert. denied, 502 U.S. 867 (1991),
to bar plaintiffs' claims because plaintiffs had agreed to a
dismissal of their defamation action for failure to prosecute.
We will reverse.
                              I.
        In July 1991, while DeCaro was a partner at O'Malley and
Miles, Wassall and the Populist Party engaged DeCaro's services
to sue The Spotlight, a political newspaper, and several other
defendants ("defamation defendants"), for printing negative
stories about Wassall and the Populist Party.  After the
defamation suit was removed to federal court by the defamation
defendants in October 1991, DeCaro failed to serve three
defamation defendants, Mr. Piper, Mr. Tiffany, and Mr. Ryan,
within the allotted 120 days.  Although the court extended the
time for service, DeCaro again failed to serve them.
        In December 1992, DeCaro left O'Malley and formed the new
firm of DeCaro, Doran, Siciliano, Gallagher, Sonntag & DeBlasis,
where he continued to represent plaintiffs in the defamation
action.  Over eighteen months after he filed the complaint,
DeCaro still had not served the three defendants.  Consequently,
in July 1993, the court dismissed the claims as to these three

defendants for lack of service.

In litigating the underlying defamation case, DeCaro's stewardship was shoddy at best. The record indicates that he missed several deadlines, misfiled pleadings, and finally, failed to file a pretrial statement required by the magistrate judge. After DeCaro failed to file the pretrial statement, the magistrate judge held a hearing to determine if plaintiffs' defamation suit should be dismissed for failure to prosecute. At argument, the magistrate judge agreed to give DeCaro two more weeks to work toward settlement and to file the pretrial statement, but Wassall suggested that the plaintiffs' defamation claims and the defamation defendants' counterclaims be dismissed for failure to prosecute. Plaintiffs assert that they agreed to the dismissal because they "did not wish to suffer with defendants any longer and [wanted] to put a merciful end to two and a half years of malpractice. . . ." Defamation defendants agreed to the mutual dismissals, and the magistrate judge recommended that the district court dismiss the claims and counterclaims for failure to prosecute. The district court adopted the magistrate judge's recommendation and dismissed both actions, thus ending the defamation action.

Plaintiffs then filed this legal malpractice action against DeCaro, the DeCaro firm and the O'Malley firm. Plaintiffs allege numerous acts of malpractice by DeCaro, inter alia: failing to work diligently to settle the case, which resulted in an unfavorable settlement; failing to move the case toward trial; failing to serve three of the defendants in the defamation action; failing to object to the magistrate judge's recommendations timely; failing to meet almost every deadline; failing to answer the counterclaim timely; failing to request that the court set aside default judgments; filing a motion to dismiss the counterclaim on behalf of counterclaim-defendants who had not been served, but not on behalf of those who had; failing to amend the complaint to incorporate many alleged ongoing libels; misrepresenting, repeatedly, what services he would perform for plaintiffs; failing to file a motion to dismiss the counterclaims in the case filed by defendants/counterclaim-plaintiffs and instead filing it in plaintiffs' case; misrepresenting himself as an expert in defamation litigation; failing to proceed with discovery; failing to request extension of discovery deadlines and misrepresenting to plaintiffs that he had; and failing to provide plaintiffs with filed documents. Plaintiffs were unsatisfied with DeCaro's stewardship in every aspect.

The malpractice defendants filed a motion to dismiss, which the district court denied. The court granted malpractice defendants' motion to bifurcate discovery and limit discovery to whether Muhammad barred the malpractice suit. After limited discovery, malpractice defendants filed a motion for summary judgment, which the district court granted. The district court believed that, because plaintiffs agreed in the underlying action to permit the court to dismiss for DeCaro's failure to prosecute, the dismissal constituted a settlement, and that, under Muhammad, the settlement barred the malpractice action.

II.

Plaintiffs appeal, arguing that agreeing to dismissal of the underlying defamation suit for failure to prosecute was not a "settlement," and that even if it were a settlement, this would not bar their suit.  We need not resolve whether this constitutes a settlement.

As a federal court sitting in diversity, we must do what we predict the Pennsylvania Supreme Court would do. See, e.g., Erie Castings Co. v. Grinding Supply, Inc., 736 F.2d 99, 100 (3d Cir. 1984).  In making this determination, we give proper regard to the opinions of Pennsylvania's intermediate courts.  See id. at 100.  The policies underlying applicable legal doctrine, current trends in the law and decisions of other courts also inform our decision. See id.

Viewing the facts in the light most favorable to plaintiffs, as we must when reviewing a grant of summary judgment, it appears that DeCaro did not negotiate and complete a settlement, frustrated efforts to have the case amicably resolved, wasted the resources of the courts by his "footdragging," and seriously impaired plaintiffs case, necessitating the agreement to have the case dismissed.  We predict that given these allegations and this record the Pennsylvania Supreme Court would not extend its holding in Muhammad to bar this action.

A.

Applying Muhammad, the district court held that

[u]nder Pennsylvania law, a dissatisfied plaintiff may not maintain a suit for legal malpractice against his attorney following a settlement to which the plaintiff agreed.

The court erred, however, by not heeding the policy concerns expressed in Muhammad.

Indeed, we believe the district court interpreted Muhammadtoo broadly, ignoring subsequent opinions by the Pennsylvania Superior Court which are well-reasoned and interpret Muhammadnarrowly.  We are convinced that the case was meant to bar an action against an attorney who negotiates and consummates a settlement or similar agreement.  We predict that the Pennsylvania Supreme Court would consider the policies enunciated in Muhammad and find that they favor allowing the plaintiffs' present action for malpractice.

B.

The Pennsylvania Supreme Court announced in Muhammad that a client who becomes dissatisfied with an attorney's settlement of an action, which the client had accepted, cannot then sue the attorney for malpractice.  In Muhammad, the plaintiffs originally sued a hospital and others for medical malpractice.  During settlement negotiations, the hospital offered $23,000.00 to settle the case and plaintiffs communicated their acceptance to their attorney.  The court suggested that the hospital increase its offer to $26,500.00, which it did.  Again, plaintiffs accepted the settlement.  Later, plaintiffs informed their attorney that they were no longer satisfied with the amount of the settlement.  Notwithstanding the plaintiffs' protest, the court enforced the agreement.  Plaintiffs then hired new counsel

and appealed, but the enforcement was affirmed on appeal. Undeterred, plaintiffs filed a malpractice suit against their trial attorney. On appeal, the Pennsylvania Supreme Court adopted a rule that important policy considerations supporting settlements barred the subsequent legal malpractice action.

Although motivated by several considerations, the encouragement of settlement was the most important motivating factor for the court's decision. It opined:

> The primary reason we decide today to disallow negligence or breach of contract suits against lawyers after a settlement has been negotiated by the attorneys and accepted by the clients is that to allow them will create chaos in our civil litigation system. Lawyers would be reluctant to settle a case for fear some enterprising attorney representing a disgruntled client will find a way to sue them for something that "could have been done, but was not." We refuse to endorse a rule that will discourage settlements and increase substantially the number of legal malpractice cases. A long-standing principle of our courts has been to encourage settlements; we will not now act so as to discourage them.

587 A.2d at 1349 (emphasis added).

The court also expressed its disfavor of "litigation concerning litigation:"

> Particularly troublesome to the efficacy of the courts are these "second bite" cases; they require twice the resources as a single case, yet resolve only a single litigant's claims--thus denying access to the courts to litigants who have never had a single resolution of their dispute. For that reason, henceforth we should view "litigation concerning litigation" cases with a jaundiced eye.

Id. at 1350. As noted by the Pennsylvania Supreme Court, the policy of avoiding "litigation concerning litigation" is aimed at preserving resources and allowing access to the courts by other litigants. The court, however, did not justify the decision to bar the malpractice action primarily based on this concern, but on the goal of encouraging settlements.

The Pennsylvania Superior Court originally read Muhammad broadly, see Miller v. Berschler, 621 A.2d 595, 598 (Pa. Super. 1993) (Wieand, J., dissenting). The en banc court, however, in McMahon v. Shea, 657 A.2d 938 (Pa. Super. 1995) (en banc) (five judge majority, four in dissent, with one concurring statement), alloc. granted, 674 A.2d 1074 (Pa. 1996), overturned the panel's decision in Miller. In several cases, the Superior Court has held that legal malpractice actions are not barred: 1) if the attorney sued did not settle the case; (2) if the malpractice plaintiff was forced to settle because of the attorney's negligence; or (3) if the malpractice plaintiff does not try to question, retrospectively, the amount of the settlement the attorney negotiated. See, e.g., White v. Kreithen, 644 A.2d 1262 (Pa. Super.), alloc. denied, 652 A.2d 1324 (Pa. 1994); McMahon. All three of these situations operate in this case. Even

assuming that plaintiffs' agreement to the dismissal for failure to prosecute constituted a settlement of the underlying action, under the superior court authority, the plaintiffs would be allowed to prosecute this malpractice case.

At one point in Muhammad, discussing the fraud exception, the Pennsylvania Supreme Court states:

> It is not enough that the lawyer who negotiated the original settlement may have been negligent; rather, the party seeking to pursue a case against a lawyer after settlement must plead, with specificity, fraud in the inducement.

587 A.2d at 1351 (emphasis added). Superior court cases have interpreted the language in Muhammad referring to the attorney having negotiated the settlement, 657 A.2d at 1349, 1351, to mean that Muhammad applies only to malpractice actions in which the client sues the attorney who negotiated and completed the settlement. See, e.g., White; see also Goodman v. Kotzen, 647 A.2d 247 (Pa. Super. 1994) (malpractice action allowed against attorney who did not consummate settlement, but not allowed as to attorneys who did), alloc. denied, 655 A.2d 989 (Pa. 1995). This narrow reading of Muhammad comports with the express policy concerns prompting the Pennsylvania Supreme Court's decision.

In White, a case more analogous to the situation here, the superior court concluded that when a client is forced to settle a case because of the attorney's negligence, the attorney may not invoke Muhammad to preclude the malpractice claim, stating:

> [A]fter appellant discharged appellees, allegedly for failure to properly investigate and prepare her case for trial, appellant was forced, due to her inability to retain counsel, to accept the settlement figure proposed by the judge. Moreover and quite importantly, none of the motivating reasons for the Supreme Court decision in Muhammad would be achieved by finding the instant malpractice action barred. . . .

644 A.2d at 1265; accord Lowman v. Karp, 476 N.W.2d 428 (Mich. Ct. App. 1991) (plaintiff put in position where settlement was only choice may sue for malpractice); Edmondson v. Dressman, 469 So.2d 571 (Ala. 1985) (same); Prande v. Bell, 660 A.2d 1055 (Md. Ct. Spec. App. 1995) (client told she had no choice but to settle may sue attorney for malpractice).

Malpractice defendants argue that plaintiffs were not "forced" to settle. This misses the point. Plaintiff "wanted out" of the case, not for what they were getting in a settlement, but because DeCaro had so shabbily represented them that they merely wanted an end to the legal travail DeCaro had inflicted upon them. The allegations and matters of record, taken in the light most favorable to plaintiffs, suggest that, like the plaintiff in White, plaintiffs here had little other choice.

Malpractice defendants' reliance on Martos v. Concilio, 629 A.2d 1037 (Pa. Super. 1993) and Spirer v. Freeland Kronz, 643 A.2d 673 (Pa. Super. 1994), alloc. denied, 673 A.2d 336 (Pa. 1996), is misplaced. In both Martos and Spirer the attorney sued for malpractice had done what he was hired to do: the attorney had negotiated and completed the settlement agreement. Moreover,

both cases were decided before the superior court decision in McMahon which announced that Muhammad was to be construed more narrowly.

> Malpractice defendants assert that [a]ny settlement negotiations of Mr. DeCaro were precluded by the appellants' actions in requesting that the underlying actions be dismissed. Thus, appellants cannot now be heard to complain that Mr. DeCaro failed to negotiate the settlement to which Mr. Wassall agreed.

This argument might be persuasive had DeCaro exerted a modicum of effort towards settlement. The record reveals that at every turn DeCaro missed yet another deadline. Of equal significance, the record also suggests that he further jeopardized the plaintiffs' defense to the counter-claim filed against them. With every minute the case continued with DeCaro, plaintiffs' negotiation position arguably waned and it became less likely that the defamation defendants would be willing to settle the claims and counter-claims on favorable terms, if at all. DeCaro cannot seriously argue that, because plaintiffs wanted him out of the case so bad that they were willing to accept a dismissal of their own case, he is entitled to walk away from his acts and omissions. Accepting this argument, surely, far from encouraging settlements, would reward indolence and incompetence.

Although the Pennsylvania Superior Court has viewed Muhammadnarrowly, it has done so not by creating artificial distinctions, but by paying heed to the policy concerns underlying the Pennsylvania Supreme Court's holding in Muhammad. A federal district court in this circuit also has adopted the Superior Court's position that Muhammad does not announce a broad rule. In Builders Square, Inc. v. Saraco, 868 F. Supp. 748 (E.D. Pa. 1994), the client sued its attorney for malpractice. The district court distinguished Muhammad, stating:

> This is not an action by a client who later became dissatisfied with a settlement agreement consummated by his attorney with the client's assent. It is an action by a client dissatisfied with his attorney for allegedly failing to communicate settlement offers and depriving his client of an opportunity to settle a case on terms far more favorable than those later available in the circumstances in which the client was placed by the attorney's conduct.

Id. at 750.

The district court in Builder's Square emphasized that its ruling did not frustrate Pennsylvania's policy of encouraging settlement because the attorney's negligence involved his failure to communicate an earlier, more favorable, settlement offer. It also distinguished Martos and Spirer by stating that those cases involved clients who had become dissatisfied with the consequences of their own decision to settle and were merely expressing "retrospective unhappiness" with the settlement agreement. The client in Builder's Square was dissatisfied at the time of settlement, but was trying to mitigate the effects of the attorney's negligence.

C.

The policies expressed in Muhammad, to preserve resources and allow access to the courts by other litigants, are served by allowing the present action for malpractice. Plaintiffs' allegations, if proven, show an enormous waste of the court's time by an unprepared attorney. Where the attorney's conduct in this regard "forces" a client to acept a dismissal of the case, allowing a subsequent malpractice action serves as a systemic deterrent for this behavior and thus promotes the policies articulated in Muhammad. An attorney who has neglected his role as steward, hopelessly delaying, and perhaps prohibiting, the system from properly resolving his client's case, should not be able to seek safe haven in a dismissal that resulted because the client could not risk allowing the attorney further to neglect his role. Under these conditions, we are convinced that the Pennsylvania Supreme Court would not shield DeCaro from liability under the guise of encouraging settlements in general.

Moreover, DeCaro's alleged conduct runs counter to the policy of encouraging settlements. It would be perverse, indeed, if under Muhammad, the Pennsylvania Supreme Court would not allow this case to go forward. One of plaintiffs' major complaints is DeCaro's footdragging in settlement negotiations. This conduct is documented by plaintiffs' letters to counsel urging him to settle the case, and letters from defamation defendants' counsel complaining of DeCaro's failure to negotiate at all regarding settlement over a three-month period. Had DeCaro worked diligently toward a settlement, this malpractice action might never have been filed and the underlying action probably could have been resolved more favorably to his clients. This would have allowed other litigants their day in court sooner. Discouraging this conduct would serve the salutary purposes articulated by the Pennsylvania Supreme Court in Muhammad.

Furthermore, the Pennsylvania Supreme Court articulated in Muhammad, as an additional reason for its decision, that "settlements reduce the stress and concrescent negativity associated with protracted litigation." 587 A.2d at 1351. The record suggests that as DeCaro delayed, defamation defendants became less willing to agree to settle their personal differences with plaintiffs and to refrain from printing derogatory stories in The Spotlight in the future. Were a jury to find this persuasive, the evidence would support a conclusion that DeCaro's conduct increased rather than decreased the stress and negativity by protracting the litigation.

We believe that the Pennsylvania Supreme Court would consider the policies articulated in Muhammad, the superior court cases interpreting Muhammad narrowly, and the jurisprudence of other states, in determining whether it would extend Muhammad to bar this present action. Having done so, we predict that it would conclude that a broad reading of Muhammad would be an unwise course which would run counter to the important policy goals it expressed therein. Therefore, we hold that Muhammaddoes not bar plaintiffs' malpractice action.

III.

Although the action is not barred, defendants assert that

plaintiffs cannot show any harm. Plaintiffs specifically allege that they were harmed by counsel's failure to serve three defamation defendants, which resulted in the court's dismissal of the case against those defendants for lack of service. Plaintiffs also allege that counsel did not engage in discovery, seriously hampering their ability to prove their claims had they gone to trial. A letter from defamation defendants' counsel indicates that his clients had been amenable to an agreement which would include a provision that, in the future, they would refrain from engaging in the conduct complained of by plaintiffs. The letter also indicates that as DeCaro procrastinated, defamation defendants became less amenable to refrain from disparaging remarks. The record has sufficient allegations and is replete with evidence of DeCaro's omissions and the resulting harm to plaintiffs. Indeed, in the defamation case the magistrate judge and district judge often resolved motions against plaintiffs based on DeCaro's failure to comply with procedure, failure to respond to pleadings, and his failure to follow the court's previous orders. These allegations, if established to the satisfaction of a fact-finder, would be sufficient to establish harm.

IV.

The O'Malley firm asserts as an alternative basis for affirming the summary judgment in its favor that it cannot be held liable for malpractice because, at the time DeCaro left the O'Malley firm, although DeCaro had not served Pifer, Tiffany, and Ryan within the 120 days contemplated by the Federal Rules, DeCaro had been given more time to complete service. Further, it argues, the dismissal of these defamation defendants for failure to serve did not occur until well after DeCaro left the O'Malley firm. Therefore, DeCaro's alleged negligence did not come to "fruition" until after DeCaro left. With respect to discovery negligence, the O'Malley firm makes the same argument:

> O'Malley & Miles, however, cannot be held responsible for any alleged legal malpractice arising out of the failure to initiate discovery efforts as adequate time to conduct discovery existed even after DeCaro had left O'Malley & Miles . . . . The initial defamation suit filed by Wassall wherein he had hired DeCaro was still being litigated and discovery was still proceeding while DeCaro was working at his new law firm. . . .

The district court did not discuss this basis for summary judgment in its opinion because initial discovery in this malpractice action had been limited to the Muhammad issue. Plaintiffs argue that, because discovery was limited to the Muhammad issue, affirming on this ground would be unfair. They add that allocating fault among the two firms and DeCaro is not properly performed on summary judgment.

The extent of O'Malley's liability and involvement has not been thoroughly briefed due to the bifurcated discovery. In their joint motion requesting the district court to bifurcate discovery and initially limit it to the Muhammad issue, the malpractice defendants stated:

> Plaintiffs' Complaint contains twenty-one (21) counts

of alleged malpractice, in connection with the underlying defamation actions which involved sixteen (16) parties. As such, it is anticipated that discovery regarding the underlying action will entail numerous depositions, interrogatories, requests for production of documents and requests for admissions.

Thus, affirming on this ground would deny plaintiffs the opportunity to conduct discovery and properly defend against the summary judgment motion.

The O'Malley firm also overlooks the fact that the three defamation defendants who were not served within the 120 day time period were not served while DeCaro worked for the O'Malley firm. O'Malley essentially argues that because DeCaro's negligence continued after he left the firm, it is relieved of its potential liability. But the retainer agreement drafted by O'Malley provides that it is between the O'Malley Firm (by DeCaro) and plaintiffs. The agreement lists O'Malley as "the Attorney" and DeCaro as the "Attorney who will be primarily responsible for the representation of the Client." Nowhere does it state that all liability for professional negligence travels with the primary attorney.

Because discovery was bifurcated at the O'Malley firm's request, we will not affirm on this alternative ground. Plaintiffs should be given a full opportunity to support their allegations regarding the O'Malley firm's liability in the district court after discovery.

V.

In sum, we reverse the summary judgment in favor of defendants and remand for further proceedings consistent with this opinion.