# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2104-17T4

NORTHERN INTERNATIONAL
REMAIL AND EXPRESS CO.
and STEFAN PUZYK,

      Plaintiffs-Respondents/
      Cross-Appellants,

v.

COFFEY & ASSOCIATES, PC,
GREGORY J. COFFEY, ESQ.,
and RICHARD J. DEWLAND,
ESQ.,

      Defendants,

and

McELROY, DEUTSCH,
MULVANEY & CARPENTER,
LLP, and GEORGE PARSELLS,
III, ESQ.,

      Defendants-Appellants/
      Cross-Respondents.

_____

Argued February 11, 2020 – Decided June 10, 2020

Before Judges Hoffman, Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1187-14.

Jared James Limbach argued the cause for appellants/cross-respondents (Donnelly Minter & Kelly LLC, attorneys; Patrick J. Galligan, of counsel; Jared James Limbach, on the briefs).

Bruce D. Nimensky argued the cause for respondents/cross-appellants (Gray Law Group, LLC, attorneys; Bruce D. Nimensky, on the brief).

PER CURIAM

This legal malpractice action arises out of underlying environmental litigation concerning a commercial property. Defendants Coffey & Associates, Gregory J. Coffey (Coffey) and Richard J. Dewland (collectively the Coffey defendants) represented plaintiff, Northern International Remail and Express Company (Northern), in the environmental litigation. When a conflict of interest arose regarding the representation of Northern, Coffey asked appellant George Parsells, III, a partner at McElroy, Deutsch, Mulvaney & Carpenter, LLP (the McElroy defendants or defendants) to represent Northern. It is Parsells's representation of Northern during mediation, settlement negotiations and the execution of the settlement agreement that is at issue in the malpractice litigation.

2                                                          A-2104-17T4

The plaintiffs here, Northern, and its owner, Stefan Puzyk, settled their malpractice claims against the Coffey defendants before trial. The allegations against the McElroy defendants were tried before a jury. The jury also considered and determined the liability of the Coffey defendants for comparative negligence purposes.

The jury awarded $100,000 to Northern, attributing sixty-five percent of liability to the Coffey defendants and thirty-five percent to the McElroy defendants. The jury also awarded $100,000 damages to Puzyk, splitting the liability equally between the Coffey and McElroy defendants. The trial court awarded plaintiffs $66,452.96 in attorney's fees and costs.

The McElroy defendants challenge multiple orders issued by the trial court before, during and after the trial. Plaintiffs cross-appeal the counsel fee award. After a careful review of the respective contentions, in light of the record and applicable principles of law, we affirm all of the disputed orders with the exception of the judgment in favor of Puzyk. We vacate the judgment for Puzyk and remand for the dismissal of Puzyk's individual claim against the McElroy defendants. As we affirm the counsel fee award, we dismiss the cross-appeal.

A-2104-17T4

## I.

We provide some facts from the underlying litigation for context. We derive the facts from our opinion issued in the appeal from the environmental action. N. Int'l Remail & Express Co. v. Robbins, No. A-4652-08 (App. Div. Aug. 18, 2010).

Northern purchased the commercial property in 1991 from Lester Robbins, and his business, Milltown Court Associates. Id., slip op. at 2. In 1998, Puzyk discovered the property was contaminated. Id. at 8-9. An environmental investigation concluded the contamination might be attributable to Baron-Blakeslee, Inc. (Baron), a division of Purex Industries, Inc. (Purex), the predecessor-owner to Robbins. Id. at 3. Honeywell is the corporate successor-in-interest to Baron. Ibid.

Northern, through Puzyk, entered into a Memorandum of Agreement (MOA) with the New Jersey Department of Environmental Protection (DEP) in which it agreed to conduct a cleanup of the property with DEP oversight. However, Northern never remediated the property.

In July 2003, after filing for bankruptcy, Northern entered into a contract of sale with Satec, Inc., which initially agreed to purchase the property for $975,000. However, after Satec obtained its own environmental studies that

revealed more extensive groundwater and soil contamination, Puzyk reduced the purchase price. The cleanup cost was estimated at $438,000.[1] In December 2003, the bankruptcy court authorized the sale of the property to Satec for $400,000. Satec agreed to remediate the property.

In 2005, Northern and Satec sued Robbins, Milltown Court Associates, Purex, and Honeywell under the New Jersey Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11 to -23.24, and common law, to recover the $438,000 credit Northern extended to Satec for clean-up costs. The complaint alleged, among other things, that Baron discharged hazardous substances into the soil and/or groundwater, and that Purex and Honeywell, as corporate successors to Baron, were liable for the discharge under the Spill Act.[2] It further alleged that Robbins and Milltown Court Associates, as previous owners of the property, were also liable. The Coffey defendants filed the complaint and represented both plaintiffs.

---

[1] There were additional credits tendered to Satec which are not at issue in this appeal.

[2] Though named as a defendant, Purex did not participate in the underlying litigation, "presumably because Honeywell was acting as Baron's successor-in-interest." N. Int'l Remail & Express Co., slip op. at 3 n.2.

A-2104-17T4

During the course of the litigation, in April 2009, the court granted Robbins's motion for summary judgment on the Spill Act claim because the evidence did not demonstrate a discharge had occurred during Robbins's ownership of the property. N. Int'l Remail & Express Co., slip op. at 2-3. The common law claims against all parties were dismissed because the six-year statute of limitations had expired before the complaint was filed. Id. at 2. We affirmed. Id. at 17.

Prior to the dismissal of Robbins, in February 2008, Northern and Satec agreed to mediate their Spill Act claims against Honeywell. The settlement negotiations with Honeywell began in February 2008 and continued into January 2009, when a settlement was reached, and a subsequent agreement signed.

During a session in March 2008, the mediator, retired Superior Court Judge Mark Epstein, identified a conflict of interest stemming from Coffey's dual representation of Northern and Satec. This related to the discussions that arose during mediation regarding the Coffey defendants' fee. Coffey stated the retainer agreement with Northern executed in November 2004 included a thirty percent contingent fee. There was no retainer agreement with Satec.

Coffey was instructed by the mediator to procure additional counsel to represent the two entities. As a result, Coffey enlisted Parsells to represent

Northern, and Patrick Spina entered into the settlement discussions on behalf of Satec.

<center>II.</center>

As stated, the legal malpractice action arises out of Parsells's representation of Northern during the settlement negotiations with Honeywell. Plaintiffs essentially claim Parsells should have procured a more favorable settlement for Northern in the environmental litigation. We derive the following facts from the summary judgment record and trial testimony.

According to Puzyk, he retained the Coffey defendants to recover from Honeywell the $438,000 credited to Satec from the purchase price of the property. Puzyk testified he was aware that, early in the litigation, Coffey sent a demand letter to Honeywell seeking $1.25 million dollars in damages. Coffey told him that "1.25 million dollars was what was recoverable."

Puzyk recalled Coffey advising him during a mediation session at Judge Epstein's office that it was a conflict for Coffey to represent both Northern and Satec, and that he was going to get another lawyer for Northern. That lawyer was Parsells. According to Puzyk, Coffey said he would pay Parsells $10,000 for Parsells's representation of Northern.

A-2104-17T4

Puzyk maintained that he first met Parsells at a mediation session at Epstein's office in late November or early December 2008, "when the negotiations were drawing to a conclusion . . . ." He stated this was six to eight weeks before the settlement agreement was executed and after many mediation sessions with Judge Epstein. Coffey told him that Parsells would participate in the mediation and represent him and Northern for purposes of finalizing the settlement agreement.

Puzyk recalled that, before the mediation session began, Coffey explained his litigation strategy to Parsells, and Coffey and Parsells repeatedly told him that "it was important to settle with Honeywell to get Honeywell out of the case in order to successfully pursue the other defendants in the case." Parsells also told him that it was in Puzyk's best interest to settle with Honeywell "because the real money in this case was to come from suing the remaining defendants." After this discussion, the three men went into a conference room where Epstein and counsel for the other parties were present. Coffey introduced Parsells as the attorney representing both Puzyk and Northern.

Puzyk also recalled his dissatisfaction when Coffey told him during mediation that one of the proposed settlement terms was that Honeywell would pay Coffey $150,000. He stated that Parsells was not involved in that

8

conversation. He also testified that Coffey told him at some point that Honeywell wanted to manage the cleanup as opposed to making a large cash contribution.

Puzyk testified that he met with Parsells a second time, at Parsells's office in December 2008, to review the terms of the settlement agreement. Coffey was also present during the meeting. Coffey and Parsells discussed the settlement terms with him, and Parsells again "repeatedly advised" him that it was in his best interests to settle with Honeywell and get them "out of the picture" so that he could "successfully proceed against the remaining defendants."

According to Puzyk, Parsells went over the agreement with him during this meeting. Puzyk recalled he "was really not happy with it" because under its terms, Coffey received $150,000, Satec received $25,000, while Northern only received $75,000. Additionally, Puzyk remained responsible for the cleanup under the MOA with DEP. Puzyk told Coffey and Parsells that he did not want to sign the agreement. Despite his reservations, Parsells "urged [him] to settle" and "take the agreement" because they "had to take Honeywell out of the picture" as Honeywell had "deep pockets" and "could tie [him] up in court for years." Parsells emphasized that "the real money" would come from Robbins, the remaining defendant. Puzyk stated that Coffey also advised him to sign the

agreement. Puzyk testified he "absolutely" relied upon Parsells's advice because he was a partner at a major law firm and "[h]is word carried a lot of weight."

During his deposition, Puzyk produced three emails sent in December 2008 to Parsells pertaining to settlement negotiations between plaintiffs and Honeywell. A December 8, 2008 email from Honeywell's attorney included an attachment of a draft settlement agreement.[3]

Puzyk stated he heeded the advice of Coffey and Parsells and signed the settlement agreement in January 2009. The fifteen-page settlement agreement between Northern, Satec and Honeywell included the following terms relevant to this appeal:

- Honeywell agreed to pay Northern $75,000, with the consent of Satec;

- Honeywell agreed to pay Satec $25,000;

- Honeywell agreed to pay the Coffey defendants $150,000 "for all attorney[']s fees, costs, expert fees, and litigation and mediation expenses incurred by Satec, Northern and Puzyk.";

- Honeywell agreed to manage the cleanup of the property. However, Northern and Puzyk

---

[3] During discovery in the malpractice action, plaintiffs' counsel obtained the emails from Honeywell's attorney. The Coffey and McElroy defendants certified they were not in possession of any documents from the underlying environmental litigation.

A-2104-17T4

remained responsible for the cleanup under the 1999 MOA with DEP;

- The parties agreed that the initial $2 million dollars of approved costs of remediation would be allocated between Honeywell and Satec, with Honeywell responsible for 75% and Satec responsible for 25% (up to an aggregate cap of $500,000).[4] If the total approved costs exceeded $2 million dollars, Honeywell was responsible for the additional costs; and

- Northern agreed to indemnify Honeywell from any obligations for damages, indemnification, or contribution brought by Milltown Court Associates, and from any future claims for contribution and/or indemnity "by others concerning the presence or alleged presence of contamination on, at, under or about the Property."

Although Puzyk was not a named plaintiff in the environmental lawsuit, he was listed as a party on the settlement agreement and signed it both as an individual, and on behalf of Northern. Under Section 8.1, in exchange for the $75,000 payment to Northern, Puzyk was jointly and severally liable with Northern to Satec in the event of a breach of the agreement and further agreed to forfeit the $75,000 to Satec if a breach occurred. Northern and Puzyk also

---

[4] As detailed in the agreement, and explained by Spina during trial, Satec did not have to pay the $500,000 "out of its pocket." Instead, it agreed to a mortgage on the property up to $500,000.

agreed to "release and discharge Satec from any and all claims, causes of action, charges, expenses, escrows or any other cost, of any nature and to any extent, relating, in any manner, to the Property or Satec Real Estate Holding, LLC's purchase of the Property from Northern in December 2003."

Although Robbins had filed its motion for summary judgment in December 2008, Puzyk stated neither Coffey nor Parsells apprised him of the application during the settlement negotiations with Honeywell and before he signed the settlement agreement. In addition, Coffey never disclosed any potential settlement figures or settlement demands, including an August 2008 settlement offer of $250,000 from Honeywell. He testified he did not see Honeywell's August 2008 offer sheet until after the filing of the malpractice lawsuit.

During trial, Puzyk acknowledged that Honeywell expended more than $2 million dollars to clean up the property. He conceded he was not asked to contribute to those remediation costs.

Puzyk also testified that Coffey violated the settlement agreement by distributing only $62,000, not $75,000 to Northern, and using the balance to pay Judge Epstein's fees even though the agreement provided that the mediator was to be paid out of Coffey's $150,000 share. Coffey's attorney trust account

12

records confirmed that he distributed $13,000 from Northern's $75,000 settlement share to Judge Epstein for his fee.

Parsells's version of events substantially diverged from that presented by Puzyk. Parsells stated he and Coffey had been friends for approximately twenty years. He recalled Coffey calling him on March 25, 2008, telling him that his clients, Northern and Satec, were in mediation before Judge Epstein in an environmental lawsuit against Honeywell. Coffey said he needed help because Judge Epstein was concerned about a potential conflict of interest due to Coffey's dual representation of Northern and Satec, and Coffey's contingent fee agreement with Northern. Coffey asked Parsells if he would meet with Puzyk the following day and attend the next mediation session.

Parsells met with Coffey and Puzyk in Parsells's office on March 26, 2008, for approximately one hour. As Coffey and Puzyk discussed their negotiation strategy, Parsells stated he "just listened" to them. He learned that the cost to clean up the property was approximately $2 million dollars, and he remembered Puzyk saying that "he needed money . . . ."

The following day, March 27, 2008, Parsells attended a mediation session where the parties occupied numerous conference rooms. He testified that he sat in a conference room by himself, and that Coffey, Puzyk, and Epstein would

13

enter the room "from time to time." At one point, Epstein raised a concern about Puzyk's potential liability for the $2 million dollar cleanup cost. Parsells recalled Puzyk saying that he "wanted more money." He testified that the only conversation he had with Puzyk was "small talk" and not anything "substantive about the case." He did not think that the parties reached a settlement that day.

Although Parsells denied any discussion of a potential conflict of interest, he did recall a conversation about Coffey's contingent fee, which could potentially be one-third of $2 million dollars. Coffey, Puzyk, and Epstein were present during that conversation. Parsells also stated "there were proposals" as to the amount of Coffey's fee, but the issue was not settled that day. Parsells testified he did not know if the conflict of interest issue was resolved during the mediation session.

Once the session concluded, Parsells told Coffey and Puzyk his "services hadn't been utilized" and that, as a favor, he would not charge them for his time. He wished them luck in the case and stated he "wasn't going to have any other involvement in it." Puzyk thanked him for attending the mediation and for not charging him a fee.

According to Parsells, he never heard from Puzyk again and he had no substantive discussions with Coffey about the case. He denied meeting with

Coffey and Puzyk when Puzyk signed the settlement agreement and denied ever seeing the agreement or giving Puzyk any advice about it. Parsells acknowledged there were emails sent to his email address in December 2008, but he did not recall receiving any emails about the litigation and did not know why he was copied on them. Parsells stated his law firm searched for the emails but could not find them. He denied personally deleting any emails related to the litigation.

During the trial, Coffey testified regarding his representation of Northern and Satec in the underlying environmental litigation. He stated that mediation with Honeywell began in January or February 2008 and continued into 2009 when a settlement was reached. The funds were disbursed in July 2009.

At the first mediation session, Coffey's demand for settlement to Honeywell exceeded $1 million dollars. He stated Puzyk did not want Honeywell to do the remediation and was not interested in having any part of the settlement be in kind. He recalled, after being shown an offer letter from Honeywell dated February 19, 2008, that Honeywell offered Satec $50,000, along with sixty-five percent of the remediation costs after the first mediation session. He testified that he discussed this and all other offers and demands with Puzyk.

This initial settlement discussion prompted Judge Epstein to request Northern and Satec obtain separate counsel for the March 27, 2008 mediation session. Therefore, Coffey reached out to Parsells to represent Northern at the session.

Coffey said he first met with Puzyk and Parsells at Parsells's office on March 26, 2008. However, he recalled going to Parsells' office after Parsells and Puzyk had an initial discussion. In addition, Coffey's recollection of the March 27, 2008 mediation session differed substantially from the recall of Puzyk and Parsells.

Coffey stated Parsells and Puzyk were together in a conference room during the mediation, while he sat alone for most of the session in a different room. He said that "[a] framework of a settlement was worked out" at this session and that Honeywell "maxed out its cash contribution offer at $250,000," and agreed to pay 80% of the cleanup costs. Coffey testified Puzyk was aware after the March 27, 2008 mediation session that Northern would receive $75,000 in the proposed settlement. The proposal included a $150,000 counsel fee for the Coffey defendants.

In discussing the various counsels' roles during the March 27, 2008 mediation session, Coffey stated:

I continued to represent Satec and Northern on issues which were not of a nature that created a conflict. Satec was represented by Mr. Spina with respect to the terms of the site response that became a complicated undertaking. Mr. Parsells simply negotiated the number and then when we walked out of the mediation session where the amount, which I think was $75,000 or $100,000 was agreed to, Mr. Parsells really had no further role.

Over a month later, on May 14, 2008, Coffey emailed a preliminary term sheet to Honeywell, including a $250,000 cash payment. Honeywell countered on June 4, 2008, offering $250,000, but seeking a cap on its responsibility for cleanup costs at $1.2 million dollars. Coffey stated thereafter there were significant negotiations between Satec and Honeywell regarding the terms of the cleanup and how it would be funded.

On August 7, 2008, Honeywell sent an additional counteroffer to Coffey in which it proposed, among other things, to "[p]rovide Northern with $250,000 (in two installments) in full and complete satisfaction for any past costs or future claims," with $100,000 to be paid upon execution of the agreement and releases, and $150,000 to be paid no later than January 7, 2009. Honeywell would be responsible for up to $2 million dollars of cleanup costs and would control the remediation process. The preliminary term sheet did not include any payment for attorney's fees to Coffey or any distribution to Satec out of the $250,000.

17

This did not resolve the matter, however, as Honeywell and Satec still had not agreed upon the terms of the cleanup. Therefore, according to Coffey, he met with Spina and Judge Epstein at a restaurant in November 2008, and a mediation session took place at the Union County Courthouse in December 2008. Coffey thought Parsells attended the December mediation session.

Thereafter, Honeywell circulated numerous versions of a draft settlement agreement in which the cash component of the settlement remained at $250,000 with the Coffey defendants receiving $150,000 for counsel fees. Coffey explained that it took a long time to finalize the details of the settlement, and there were at least six draft versions of the agreement. Coffey knew Puzyk was very anxious to get the deal done and Coffey stated he kept Puzyk apprised of the settlement process. He claimed that Spina requested the $25,000 Satec received in the settlement for his counsel fees in negotiating the deal.

Coffey testified that when Puzyk finally signed the agreement in February 2009, it reflected what Puzyk had agreed to at the March 27, 2008 mediation session, and that neither he nor Parsells forced Puzyk to sign it. Coffey said Parsells was not present when Puzyk signed the agreement.

On March 5, 2009, Coffey sent a letter to the court advising that Northern, Satec, and Honeywell had fully resolved their differences. At the time, Robbins'

18

motion for summary judgment was still pending. Coffey admitted that during the litigation he told Puzyk there was the potential to recover the $438,000 credit from Robbins because he was an earlier owner of the property. However, he stated he had simultaneously advised Puzyk that Honeywell would not reimburse the $438,000 as part of its settlement. Since Northern had not spent the $438,000 to remediate its property, Honeywell contended it was not liable for those monies under the Spill Act.

During cross-examination, Coffey conceded the May, June, and August 2008 settlement term sheets did not include Northern's receipt of $75,000 or reference Coffey's $150,000 legal fee. This questioned his earlier testimony that those figures were agreed to at the March 27, 2008 mediation session.

When questioned by the court as to the reason for Parsells's involvement, Coffey testified that Judge Epstein required separate counsel for Northern and Satec because Honeywell was proposing that some of the settlement be in kind. He stated that during the March 27, 2008 mediation session, Judge Epstein spoke with him alone regarding settlement of the Coffey defendants' counsel fee.

Judge Epstein also testified at the trial. He recalled serving as a mediator in the environmental lawsuit. His records reflected mediation sessions took place on February 11, February 21, March 27, July 16, 2008 and April 20, 2009

19

at his office in New Brunswick. He noted he also attended a settlement conference outside of New Brunswick on November 26, 2008, at which Coffey and Spina were present, and a mediation session on December 4, 2008 at the Union County Courthouse.

Although Judge Epstein's billing notation concerning the third mediation session on March 27, 2008 stated that Coffey "and all plaintiffs with separate counsel" attended, he could not recall whether Parsells was present. He did remember meeting Parsells once during the course of the mediation, but he could not recall any specific interaction with Parsells during the mediation sessions. Judge Epstein did not send Parsells a bill for his mediation services.

Spina testified that he has represented Satec since 2000 and was involved with the company's purchase of the property from Northern. Pertinent to the underlying lawsuit, Spina testified that Satec was unaware that it was a named plaintiff in the environmental matter until Judge Epstein called him, forwarded a copy of the pleadings, and invited him to attend a mediation session. Spina stated he subsequently attended a mediation session at which Parsells was present, but he could not remember the date. Spina explained that during negotiations, "Satec objected to Mr. Puzyk and Northern getting anything" but felt that Coffey was entitled to a fee.

A-2104-17T4

# III.

## A.

In conjunction with the filing of the complaint, plaintiffs presented an affidavit of merit (AOM) from Steven Angstreich, Esq. The AOM set forth Angstreich's professional background and his conclusion that Parsells's conduct in connection with the Honeywell settlement agreement fell below the appropriate standard of care for New Jersey attorneys. Angstreich reviewed the complaint and the settlement agreement prior to rendering his opinion.

The McElroy defendants objected to the sufficiency of Angstreich's AOM. They contended Angstreich impermissibly based his opinion on an assumption that the allegations in the complaint were true, as opposed to reviewing the facts independently. Following a Ferreira[5] conference, the court granted plaintiffs thirty days to submit a revised AOM.

Plaintiffs thereafter presented a revised AOM within the designated timeframe. Angstreich certified he had reviewed a certification from Puzyk "swearing to the truth of the allegations contained in paragraphs 38-53 of the [c]omplaint." Angstreich's conclusions in the revised AOM mirrored those stated in the first AOM.

---

[5] Ferreira v. Rancocas Orthopedic Assocs., 178 N.J. 144 (2003).

A-2104-17T4

B.

Several months later, before discovery was completed, the McElroy defendants moved for summary judgment or, in the alternative, to dismiss the complaint on the grounds that Angstreich's first AOM was deficient. On April 21, 2015, the court denied the motion for summary judgment, stating that discovery was ongoing and there were multiple disputed issues of material fact. The court further found that Angstreich's first AOM was timely and sufficient, and noted the second AOM was "even more clearly sufficient." Defendants' motion for reconsideration was denied.

C.

The McElroy defendants filed a second motion for summary judgment, which was denied on January 26, 2017. In its statement of reasons, the court identified "genuine issues of material fact" as to whether the McElroy defendants breached the duty owed to plaintiffs and proximately caused plaintiffs' damages.

D.

On February 3, 2017, the court denied the McElroy defendants' motion to bar certain portions of Angstreich's testimony, advising a Rule 104 hearing[6] would be held prior to the expert's testimony at trial.

IV.

Prior to opening statements on July 19, 2017, the court conducted the Rule 104 hearing. The McElroy defendants contended certain aspects of Angstreich's opinion regarding damages were net opinions. Specifically, defendants argued Angstreich could not testify about the $438,000 credit given to Satec at the time of the sale of the property because Northern did not incur any costs in remediating the property. Under the Spill Act, the $438,0000 was not recoverable from Honeywell because Northern did not do any cleanup.

In addition, defendants asserted Angstreich could not testify about the Coffey defendants' fee because it also could not be recovered from Parsells in this malpractice litigation. They contended the fee could only be disgorged from Coffey.

---

[6] See N.J.R.E. 104(a) (explaining that the admissibility of evidence is to be determined by the judge out of the presence of the jury).

In denying the motion, the court stated it was unable to rule without hearing testimony from the various witnesses, in order to have some context to defendants' arguments. The court instructed defendants they could renew their motion at the end of the trial.

A.

Before the jury, Angstreich was qualified as an expert in the field of legal malpractice. He is an attorney with experience in environmental law and Spill Act litigation.

In addressing the attorney-client relationship between Parsells and Northern, Angstreich opined that the relationship began after the mediator raised a conflict issue, and Parsells agreed to represent Northern. He agreed that Parsells's role was limited to the settlement negotiations. However, he disagreed with Parsells's position that his relationship with Northern ended at the conclusion of the March 27, 2008 mediation session because Parsells was copied on the settlement-related emails from Honeywell in December 2008. The expert found it irrelevant that Parsells was not paid a fee, because a relationship begins upon the agreement to represent a client.

In addressing the standard of care required of an attorney in the context of settlement negotiations, Angstreich testified that the attorney must become

familiar with all of the underlying facts and circumstances of the case in order to assess whether a settlement is reasonable. Since Parsells did not familiarize himself with the case, he could not give Puzyk all of the facts needed to make an informed decision on behalf of Northern. Parsells needed to know what was happening in the environmental litigation, the parties' status, the relative liabilities of Robbins and Honeywell, and the facts surrounding the $438,000 credit for which Northern sought reimbursement. In his opinion, Northern was entitled to recoup the $438,000 under the Spill Act as a remediation cost.

In addition, Angstreich opined that Parsells should have educated himself about the prior settlement offers from Honeywell and Robbins's pending motion for summary judgment so he could properly advise Puzyk. The summary judgment motion was particularly significant because Robbins contended the statute of limitations expired before Coffey filed the complaint, therefore requiring the dismissal of Northern's common law claims. Angstreich opined Puzyk should have been informed about the probable outcome of the motion, and the likelihood that Northern might not recover any damages from Robbins. This information was necessary in deciding whether to accept the settlement offer from Honeywell.

A-2104-17T4

Angstreich explained that Parsells should have also discussed with Puzyk the proposed $25,000 payment to Satec, because "Satec wasn't out of pocket any money" and "wound up getting the property cleaned up . . . ." Likewise, Parsells should have counselled Puzyk on the proposed $150,000 fee to Coffey. Angstreich opined that Parsells had a duty to assess the reasonableness of the fee because it was double what it should have been.

In sum, Angstreich opined that Parsells should have explained all of the ramifications of settlement to Puzyk to enable him to make an informed decision, as opposed to only advising him to take the settlement. He further opined that the settlement was not in Northern's best interest, and instead favored Satec and Honeywell. He explained that Northern "derived no benefit [from the settlement] . . . because if Honeywell stopped cleaning up the property[,] Northern was still responsible and so was Mr. Puzyk."

Angstreich further opined that Parsells's deficient advice to Puzyk concerning the settlement agreement was a proximate cause of Northern's damages, which included the excessive fee to Coffey and the failure to recoup the $438,000 credit. The expert explained that, while Coffey initially put Northern "in a bad position" due to his mishandling of the litigation, Parsells could have said "this is a bad settlement and here are the reasons why" and

stopped Coffey from collecting a fee well in excess of what was agreed upon in the contingent fee arrangement.[7]

Although Angstreich opined that Parsells had a duty to ask for the return of the $438,000 credit during the settlement negotiations, he conceded during cross-examination that there was no evidence to indicate that Honeywell or any other party was willing to give Northern $438,000. Also, there was no evidence to indicate that Honeywell was willing to settle with Northern for more than $250,000.

## B.

The McElroy defendants presented Arnold Lakind, Esq. as an expert in the field of legal malpractice related to litigation and environmental law. It was his opinion that Parsells and the McElroy defendants did not breach any duty owed to Northern during the settlement negotiations.

Lakind stated that Parsells's representation of Northern was "very limited" and spanned just three days in March 2008, because Parsells stopped representing Northern after the mediation session on March 27, 2008. He also pointed to the lack of a retainer agreement, which "suggested . . . there was no

---

[7] Angstreich also opined that Coffey breached the standard of care he owed to Northern, and that breach was a proximate cause of plaintiffs' damages.

A-2104-17T4

long-term representation," and the fact that Parsells was not paid for his services. In addition, the expert noted that the majority of emails sent after March 2008 were not sent to Parsells.

Lakind reasoned that since the settlement was reached in January 2009, not in March 2008, and "[t]here was no inquiry made of [Parsells] during the course of that mediation," Parsells could not have breached any duty owed to Northern during the course of his limited representation. In his opinion, nothing happened at the mediation session that could have proximately caused plaintiffs to incur damages related to the settlement.

Lakind conceded during cross-examination there was a conflict regarding Coffey's fee. However, he maintained since Coffey collected the excessive fee, it was he, not Parsells, who proximately caused plaintiffs' damages. Therefore, plaintiffs' recourse was to recover the excess fee from Coffey.

Even assuming Parsells's representation continued and he breached his duty to advise Northern concerning the settlement, Lakind concluded Northern was not harmed by Parsells's actions. The expert described the settlement as "a very good settlement" for Northern because it could not have recovered any money damages under the Spill Act, and its common law claims were not viable due to the expiration of the statute of limitations.

Lakind did not find the MOA obligation significant because plaintiffs could have moved to enforce the settlement agreement if Honeywell failed to complete the cleanup. He thought it was "a tremendous advantage" to Northern to have Honeywell responsible for the remediation because of Honeywell's level of expertise and familiarity with the process. He found no indication in the record to support a theory that either Satec or Honeywell would have settled the case any differently than they did, or that a "better deal" could have been achieved for Northern.

<center>V.</center>

Following the completion of the presentation of evidence, the McElroy defendants moved for an involuntary dismissal under Rule 4:37-2(b), and for judgment pursuant to Rule 4:40-1. Defendants argued there was no evidence that Northern could have obtained a different settlement. Therefore, plaintiffs failed to establish any negligence on defendants' part that was a proximate cause of any damages. The court denied the Rule 4:37-2(b) motion, and reserved decision on the motion for judgment until after the jury verdict.

During closing arguments, plaintiffs' counsel explained to the jury that his clients sought two elements of damages. Plaintiffs contended they should have received an additional $100,000 from the $250,000 Honeywell settlement

<center>29</center>

monies.  The $100,000 was calculated as the $25,000 allocated to Satec and the excess $75,000 Coffey took as a fee.  Plaintiffs asserted Coffey was only entitled to a $75,000 fee, not the $150,000 he received.  In addition, plaintiffs sought the $438,000 credit from the purchase price of the property.  Therefore, they asked for $538,000 in damages.  Counsel did not specify whether that amount should all be awarded to Northern or whether Puzyk individually was also entitled to damages.

In its instructions to the jury, the court stated:

> Instructions regarding multiple plaintiffs.  By now you've noticed there are two plaintiffs.  Northern International Express Company and Stefan Puzyk.  When I told you earlier that the plaintiffs have the burden of proving the liability of Mr. Parsells, that means that Northern and Puzyk must separately prove that Mr. Parsells is liable to each of them.  Thus[,] it is possible that you may find Mr. Parsells liable to only one of the plaintiffs, or neither of them, or to both of them.  The same can be said for Mr. Coffey.

The court also included the following in its charge on damages:

> Plaintiffs have the burden of establishing by the preponderance of evidence each item of damages that they claim.  A plaintiff must also prove that the damages were the natural and probable consequences of the attorney defendants['] actions. Damages may not be based on conjecture or speculation.

> Plaintiffs are claiming that the[] legal malpractice of either one or both of the attorney

A-2104-17T4

defendants resulted in damages to either or both of them.

During deliberations, the jury submitted the following question: "Can we consider Northern and S. Puzyk as one [and] the same? If no, please advise how to differentiate." If there was a discussion between the court and counsel as to how to respond to this question, it was not done on the record.

In responding to the question, the court told the jurors:

I'm going to read the instructions regarding multiple plaintiffs again and then I'll try to explain.

By now you should've noticed that there are two plaintiffs in this case. Northern International and Stefan Puzyk. When I told you earlier that the plaintiffs had the burden of proving the liability of Mr. Parsells that means that Northern and Mr. Puzyk must separately prove that Mr. Parsells is liable to each of them. Thus, it is possible that you may find Mr. Parsells liable to only one of the plaintiffs, or neither, or both. The same can be said for Mr. Coffey.

Can we consider Northern and Mr. Puzyk as one [and] the same? The answer is they are separate plaintiffs. So, that you will have to follow my verdict sheet and will have to make a finding as to each one of them as to each defendant. Okay. Hopefully, that makes it clearer.

Can these parties suffer the same damages? That is for you to decide. You are to decide who or what the damages were as to each plaintiff if you do find that the damages have been shown.

31

[Y]ou can't compound it. In other words, . . . you can't find that both -- how do we say it? You can't compound the damages because you know what the damages requested are, but you must determine what percentage of those damages go to each plaintiff or -- I'm sorry. What . . . percentage each defendant is responsible for if you do find damages. But you can and you must find, obviously, that there[] . . . was a duty, and that there was proximate cause, and that the damages have been shown by a preponderance of the evidence.

Later that day, the jury returned its verdict, finding both the McElroy and Coffey defendants negligent, and their negligence was a proximate cause of damages to both plaintiffs. The jury awarded Northern $100,000, attributing sixty-five percent of liability to the Coffey defendants, and thirty-five to the McElroy defendants. It also awarded $100,000 to Puzyk, individually, finding the McElroy and Coffey defendants each responsible for fifty percent of the damages.

On August 1, 2017, the court denied defendants' Rule 4:40-1 motion for judgment, finding that "reasonable minds could differ as to whether the [d]efendants were negligent, and whether their actions/inactions constituted malpractice."

Plaintiffs' counsel filed a certification in support of an application for attorney's fees and costs pursuant to Rule 4:49-2. The certification references

two retainer agreements. The first agreement was executed on March 17, 2014, when counsel was a sole practitioner. The second supplemental agreement was executed on February 20, 2015, after counsel began practicing at a firm.

Under the agreements, plaintiffs paid a $12,000 retainer fee. Both agreements set counsel's contingent fee at thirty-three and one-third percent of the first $500,000 recovered, and set an hourly rate of $350. In addition, the agreements capped the legal fees billed on an hourly basis at $35,000, or 100 hours.

The first agreement stated: "In no event shall the legal fees billed to You on an hourly basis, pending the [lawsuit], exceed $35,000.00. The hourly billing shall cease once the sum of the total billable hours equals $35,000.00." The second agreement stated: "Provided You pay the first $35,000.00 of billable hours for which you are invoiced The Firm will not seek to cease representing You during the litigation of this matter through the conclusion of the trial or settlement of this matter."

Counsel sought $87,998 in attorney's fees for over 400 hours billed between March 2014 and July 25, 2017. Some of the hours were billed at a reduced rate. While he was a sole practitioner between March 2014 and January 2015, he did not use an electronic computerized timesheet system, and therefore,

he did not submit any itemized billing records for that period. He did submit itemized billing records for the hours worked between February 19, 2015, and July 25, 2017, at the law firm, along with documentation pertaining to costs totaling $19,452.96, including expert fees, costs of depositions and the mediator's fee.

By order dated November 13, 2017, the court granted plaintiffs' motion for attorney fees and costs in part, awarding $47,000 in attorney fees and $19,452.96 in costs, for a total award of $66,452.96. The court found the retainer agreements were clear, and that counsel and plaintiffs had capped the legal fees at $35,000, aside from the contingent fee. The court explained that an adversary cannot be responsible for billing hours that are not billed to one's client. In addition, had the damages verdict been a larger award, counsel would have netted a greater fee under the contingency fee provision. However, the contingent fee here would have been less than the $35,000 capped fee amount. Therefore, the court awarded counsel $47,000 – $35,000 plus the $12,000 retainer.

The court denied the McElroy defendants' Rule 4:40-2(b) motion for judgment notwithstanding the verdict (JNOV), remittitur, or a new trial on November 16, 2017, finding that reasonable minds could differ on the outcome

and the damage awards were supported by the evidence. On December 13, 2017, the court entered a final judgment against the McElroy defendants for $151,452.96.

## VI.

On appeal, the McElroy defendants challenge the following orders: (1) the April 21, 2015 order denying their motion to dismiss the complaint for failure to serve an adequate AOM; (2) the January 26, 2017 order denying their second motion for summary judgment; (3) the February 3, 2017 order denying their motion to bar Angstreich's expert testimony as a net opinion; (4) the August 1, 2017 order denying their motion for judgment at trial; (5) the November 13, 2017 order awarding attorney's fees; (6) the November 16, 2017 order denying their motions for JNOV, a new trial, and/or remittitur; and (7) the December 13, 2017 final judgment. Plaintiffs cross-appeal the award of attorney's fees.

## A.

The McElroy defendants contend the court erred when it denied their motion to dismiss the complaint for "plaintiffs' failure to serve a timely and adequate affidavit of merit." They assert the first AOM was legally deficient because it "lacked a factual foundation," and the second AOM was untimely as it was filed beyond the 120-day statutory deadline. We review a trial court's

decision to deny a motion to dismiss the complaint de novo. Dimitrakopoulos

v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 108

(2019) (citation omitted).

"The Affidavit of Merit statute was intended to flush out insubstantial and

meritless claims that have created a burden on innocent litigants and detracted

from the many legitimate claims that require the resources of our civil justice

system." Ferreira, 178 N.J. at 154. It "was not intended to encourage

gamesmanship or a slavish adherence to form over substance." Ibid.; see Buck

v. Henry, 207 N.J. 377, 383 (2011) (explaining that the AOM statute's purpose

"is to weed out frivolous complaints, not to create hidden pitfalls for meritorious

ones.").

Angstreich's initial AOM stated the following:

> Based upon my review and analysis of the [c]omplaint and [s]ettlement [a]greement concerning the actions of attorney George H. Parsells, III, I have concluded that there is a reasonable probability that the care, skill and knowledge exercised and/or exhibited by him fell outside the customary standards and practices of New Jersey lawyers; that he failed to exercise the required skill, knowledge, ability and judgment required of him under the circumstances, and that he failed to provide sufficient information upon which Puzyk and Northern could make an informed decision as to whether to agree to the terms of the settlement. Further, it is my opinion that the firm of McElroy, [Deutsch,] Mulvaney & Carpenter, LLP failed to

A-2104-17T4

provide proper supervision and/or is responsible for the conduct of one of its members.

It is my opinion within a reasonable degree of certainty that there is a sufficient basis to pursue the instant claims against Mr. Parsells and the law firm of McElroy, [Deutsch,] Mulvaney & Carpenter, LLP. It is also my opinion, within a reasonable degree of certainty that Parsells'[s] conduct fell below the appropriate standards of care.

After a Ferreira conference, Angstreich submitted a second AOM. The conclusions were identical to those stated in the first affidavit. In addition, the expert referenced his review of a certification from Puzyk "swearing to the truth of the allegations contained in paragraphs 38-53 of the [c]omplaint." The second AOM was provided within the timeframe set by the court.

Here, Angstreich provided the attestation required by N.J.S.A. 2A:53A-27, named Parsells specifically, and briefly described how his actions fell outside acceptable professional standards. Plaintiffs filed the first AOM simultaneously with the complaint, well within the statutory deadline.

The McElroy defendants' contention that Angstreich should have reviewed additional records to substantiate the AOM is without merit. No discovery had yet occurred, and defendants do not specify what records should have been reviewed. Plaintiffs did not execute a retainer agreement with the McElroy defendants and Parsells did not have any billing records. We are

37

satisfied that Angstreich's AOM based on the sworn facts certified to by Puzyk in the complaint and his review of the settlement agreement complied with the statutory requirements under N.J.S.A. 2A:53A-27.

B.

Likewise, we are unpersuaded by the McElroy defendants' contention that the court erred in denying their motion to bar Angstreich's testimony on proximate cause and damages as a net opinion. Defendants assert the opinion was not supported by the evidence, and the $438,000 credit to Satec was not recoverable under the Spill Act.

A trial court's decision to admit or exclude expert testimony in a civil case is reviewed under "a pure abuse of discretion standard . . . ." In re Accutane Litig., 234 N.J. 340, 391-92 (2018) (citing Townsend v. Pierre, 221 N.J. 36, 52-53 (2015)). "Accordingly, the trial court's decision here should not be disturbed on appeal unless the decision was 'made without a rational explication, inexplicably departed from established practices, or rested on an impermissible basis.'" Estate of Kotsovska v. Liebman, 221 N.J. 568, 588 (2015) (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

"N.J.R.E. 703 addresses the foundation for expert testimony." Townsend, 221 N.J. at 53. Under that rule, an expert opinion must be grounded in "facts or

data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Ibid. (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)).

"The net opinion rule is a 'corollary of [Rule 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (alterations in original) (quoting Polzo, 196 N.J. at 583). In other words, the expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

"Evidential support for an expert opinion is not limited to treatises or any type of documentary support, but may include what the witness has learned from personal experience." Rosenberg v. Tavorath, 352 N.J. Super. 385, 403 (App. Div. 2002) (citation omitted); see, e.g., State v. Townsend, 186 N.J. 473, 495 (2006) (holding that an expert's "education, training, and most importantly, her experience, provided a sound foundation for her opinion" which was "not a net opinion"); but see Carbis Sales, Inc. v. Eisenberg, 397 N.J. Super. 64, 79 (App. Div. 2007) (citations omitted) ("In the context of legal malpractice, an expert

must base his or her opinion on standards accepted by the legal community and not merely on the expert's personally held views.").

We discern no abuse of discretion in the court's decision allowing Angstreich's testimony. The expert opined that Parsells was negligent in failing to request the monies during the mediation and settlement negotiations. And that his failure to properly represent plaintiffs was a proximate cause of their not recovering the $438,000 credit. The opinion was supported by the evidence and predicated upon Angstreich's experience handling legal malpractice and environmental law cases for more than thirty years.

During the Rule 104 hearing, Angstreich testified that he had successfully recovered similar monies in other matters, "so long as the credit that's given off the purchase price is directly attributed to what has been determined to be the cost to clean up" the property. Angstreich further opined that even if the credit was not recoverable under the Spill Act, Parsells should have attempted to recoup it during settlement negotiations so that Satec did not receive a windfall. We are satisfied Angstreich sufficiently supported his opinions.

C.

We next address the McElroy defendants' contention of error in the trial court's denial of their second motion for summary judgment. They assert

summary judgment was warranted because the material facts were undisputed, and plaintiffs failed to demonstrate the necessary element of proximate cause under either the "'suit within a suit' approach" or the "'expert' [testimony] approach" in a legal malpractice case.

In reviewing a summary judgment order, we are bound by the same standard as the trial court under Rule 4:46-2(c).  State v. Perini Corp., 221 N.J. 412, 425 (2015) (citations omitted).  Summary judgment is required if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995).

A court determines whether genuine issues of material fact exist by "consider[ing] whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  Id. at 540.  "The slightest doubt as to an issue of material fact must be reserved for the factfinder, and precludes a grant of judgment as a matter of law."  Akhtar v. JDN Props. at Florham Park, LLC, 439 N.J. Super.

391, 399 (App. Div. 2015) (citation omitted). "Any issues of credibility must be left to the finder of fact." Ibid. (citation omitted).

An action for legal malpractice has "three essential elements: '(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff.'" Jerista v. Murray, 185 N.J. 175, 190-91 (2005) (quoting McGrogan v. Till, 167 N.J. 414, 425 (2001)).[8]

"Like most professionals, lawyers owe a duty to their clients to provide their services with reasonable knowledge, skill, and diligence." Ziegelheim v. Apollo, 128 N.J. 250, 260 (1992) (citing St. Pius X House of Retreats v. Diocese of Camden, 88 N.J. 571, 588 (1982)). "[L]awyers' duties in specific cases vary with the circumstances presented." Ibid. That said, "[t]he lawyer must take 'any steps necessary in the proper handling of the case.'" Id. at 260-61 (quoting Passanante v. Yormark, 138 N.J. Super. 233, 239 (App. Div. 1975)). "Those steps will include, among other things, a careful investigation of the facts of the matter, the formulation of a legal strategy, the filing of appropriate papers, and

_____

[8] Parsells does not dispute the existence of an attorney-client relationship between he and Northern. He does dispute there was any attorney-client relationship between he and Puzyk individually.

the maintenance of communication with the client." Id. at 261 (citing Passanante, 138 N.J. Super. at 238-39).

"In accepting a case, the lawyer agrees to pursue the goals of the client to the extent the law permits, even when the lawyer believes that the client's desires are unwise or ill[-]considered." Ibid. (citing Lieberman v. Emp'rs Ins. of Wausau, 84 N.J. 325, 340 (1980)). "At the same time, because the client's desires may be influenced in large measure by the advice the lawyer provides, the lawyer is obligated to give the client reasonable advice." Ibid. "Accordingly, the lawyer is obligated to keep the client informed of the status of the matter for which the lawyer has been retained, and is required to advise the client on the various legal and strategic issues that arise." Ibid. (citations omitted).

"What constitutes a reasonable degree of care is not to be considered in a vacuum but with reference to the type of service the attorney undertakes to perform." St. Pius X House of Retreats, 88 N.J. at 588. Concerning the handling of settlements in particular, our Supreme Court has held:

> [W]e recognize that litigants rely heavily on the professional advice of counsel when they decide whether to accept or reject offers of settlement, and we insist that the lawyers of our state advise clients with respect to settlements with the same skill, knowledge, and diligence with which they pursue all other legal

tasks. Attorneys are supposed to know the likelihood of success for the types of cases they handle and they are supposed to know the range of possible awards in those cases.

[Ziegelheim, 128 N.J. at 263.]

"[D]eviation from accepted standards of professional care will result in liability for negligence." Ibid. "[W]e see no reason to apply a more lenient rule to lawyers who negotiate settlements." Ibid. Moreover, "[t]he fact that a party received a settlement that was 'fair and equitable' does not mean necessarily that the party's attorney was competent or that the party would not have received a more favorable settlement had the party's incompetent attorney been competent." Id. at 265.

However, "plaintiffs must allege particular facts in support of their claims of attorney incompetence and may not litigate complaints containing mere generalized assertions of malpractice." Id. at 267. "[A]ttorneys cannot be held liable simply because they are not successful in persuading an opposing party to accept certain terms." Ibid. "The law demands that attorneys handle their cases with knowledge, skill, and diligence, but it does not demand that they be perfect or infallible, and it does not demand that they always secure optimum outcomes for their clients." Ibid.

Primarily at issue in this case is whether the McElroy defendants proximately caused plaintiffs' damages, and the quantum of those damages. "The test of proximate cause is satisfied where the negligent conduct is a substantial contributing factor in causing the loss." 2175 Lemoine Ave. Corp. v. Finco, Inc., 272 N.J. Super. 478, 487 (App. Div. 1994) (citations omitted). Under this test, "there can be any number of intervening causes between the initial wrongful act and the final injurious consequences and [it] does not require an unsevered connecting link between the negligent conduct and the ultimate harm." Conklin v. Hannoch Weisman, 145 N.J. 395, 420 (1996). "The test is thus suited for legal malpractice cases," such as this one, "in which inadequate or inaccurate legal advice is alleged to be a concurrent cause of harm." Ibid. In such cases, "[t]he negligent attorney . . . often does not 'create' the risk of intervening harm . . . but rather fails to take the steps that competent counsel should take to protect a client from the risks that ultimately produce the injury." Id. at 418 (citation omitted).

"[D]amages should be generally limited to recompensing the injured party for his economic loss," that is, "the amount that the client would have received but for his attorney's negligence." Gautam v. De Luca, 215 N.J. Super. 388, 397, 399 (App. Div. 1987) (citing Lieberman, 84 N.J. at 342); see Nappe v.

Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 48 (1984) ("Compensatory damages are designed to compensate a plaintiff for an actual injury or loss."). "Actual damages are those that are real and substantial as opposed to speculative." Grunwald v. Bronkesh, 131 N.J. 483, 495 (1993). The plaintiff must "show what injuries were suffered as a proximate consequence of the attorney's breach of duty" and "[t]hat burden must be sustained by a preponderance of the competent, credible evidence" as opposed to "conjecture, surmise or suspicion." 2175 Lemoine Ave., 272 N.J. Super. at 487-88 (citations omitted).

In a written statement of reasons, the court concluded that, viewing the facts in the light most favorable to plaintiffs, there were genuine issues of material fact as to whether the McElroy defendants breached the duty owed to plaintiffs, and whether any breach was the proximate cause of any damages, as well as the extent of plaintiffs' claimed damages. The court noted Puzyk's certification, in which he maintained that neither Coffey nor Parsells told him about Honeywell's August 2008 offer, that he would not have agreed to the later settlement had he known about the offer, and that neither Coffey nor Parsells sought to recoup the $438,000 credit given by Northern to Satec upon the sale of the property. It also considered the August 2008 preliminary term sheet in

which Honeywell offered to pay Northern $250,000 without allocating any monies to Coffey or Satec, and the contingency fee agreement between plaintiffs and Coffey providing for a fee of thirty percent of any recovery plaintiffs received. In addition, the court cited Angstreich's report and its opinions regarding the McElroy's defendants' duty to plaintiffs and their breach of that duty. Angstreich also found, as discussed above, that Parsells's negligence was a proximate cause of plaintiffs' damages.

In denying summary judgment, the court stated

> a rational jury could find that had [d]efendants not committed the alleged malpractice and [p]laintiffs knew that their entire recovery would be limited to the amount they received from the Honeywell settlement, [p]laintiffs would not have agreed to Coffey receiving a $150,000 legal fee or Satec receiving $25,000 in addition to keeping the credit it received from Northern.

The McElroy defendants contend its summary judgment motion "was based on the wholly undisputed facts surrounding Northern's ownership, transfer, and legal rights with respect to the . . . property." (emphasis omitted). However, this limited characterization ignores the disputed material facts relevant to plaintiffs' legal malpractice claim against the McElroy defendants, including those pertaining to the extent and duration of Parsells's representation

of Northern and Puzyk in mediation and the settlement negotiations with Honeywell.

For instance, Puzyk contended, among other things, that he first met Parsells in November or December 2008, and that Parsells pressured him to accept unfavorable settlement terms in January 2009 during a meeting at Parsells's office. Parsells, on the other hand, claimed his role in the underlying litigation was extremely limited, and he never gave Puzyk any legal advice and did not see or speak to him after the March 27, 2008 mediation session. These, and numerous other conflicting versions of events, presented a credibility issue that "must be left to the finder of fact." Akhtar, 439 N.J. Super. at 399 (citation omitted). "The question of which version is more plausible or believable . . . is not susceptible to summary disposition." Winstock v. Galasso, 430 N.J. Super. 391, 404 (App. Div. 2013) (citing Brill, 142 N.J. at 543).

Because material facts were in dispute, the trial court properly denied the McElroy defendants' second motion for summary judgment. There also was conflicting evidence on the issues of proximate cause and damages.

### D.

We turn to the McElroy defendants' motions for judgment, JNOV, remittitur, and a new trial, all premised on the grounds that the evidence was

insufficient to be considered by a jury and to support the jury's verdict. They assert that: (1) there was no evidence to show that the other parties to the settlement would have been willing to pay Northern more than they actually did; (2) Puzyk's damages award cannot stand because he was not a party to the underlying litigation, lacked an attorney-client relationship with the McElroy defendants, and the award constituted a double recovery; and (3) disgorgement of Coffey's legal fees from the McElroy defendants should not have been permitted as a matter of law.

When reviewing decisions on Rule 4:40-1 motions for judgment and Rule 4:40-2(b) motions for JNOV, we apply the same standard that governs the trial courts. "[I]f, accepting as true all the evidence which supports the position of the party defending against the motion[s] and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion[s] must be denied[.]" Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016) (fourth alteration in original) (citation omitted).

In considering a damages verdict, we are mindful that "[a] jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness.'" Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016) (quoting Baxter v.

Fairmont Food Co., 74 N.J. 588, 598 (1977)). A new trial is only granted "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). We "will not reverse a trial court's determination of a motion for a new trial 'unless it clearly appears that there was a miscarriage of justice under the law.'" Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 572 (2016) (quoting R. 2:10-1). Courts have the power to decide whether a jury's "grossly excessive award is a miscarriage of justice" and "to enter a remittitur reducing the award to the highest amount that could be sustained by the evidence." Orientale v. Jennings, 239 N.J. 569, 590 (2019) (quoting Cuevas, 226 N.J. at 499).

The McElroy defendants moved for judgment at trial under Rule 4:40-1. The court reserved its decision and after the verdict, denied the motion, finding plaintiffs' claims remained a question of fact for the jury to decide. In its written statement of reasons, the court concluded that "reasonable minds could differ as to whether the [d]efendants were negligent, and whether their actions/inactions constituted malpractice."

In its Rule 4:40-2(b) motion, the McElroy defendants argued there was no support for the jury's award of damages to Puzyk individually. They contended

the corporate entity, Northern, instituted suit, alleging Parsells owed it a duty, and breached that duty, proximately causing Northern damages. They further asserted Angstriech's opinion supported Northern's claims against Parsells.

The trial judge disagreed. In a ruling encompassing the motions for JNOV, new trial and remittitur, he stated that the trial testimony and Puzyk's testimony "provided evidence that a reasonable jury could find that an attorney/client relationship existed between Puzyk and the defendants." The judge explained that the jury could have relied upon Angstreich's testimony that Parsells breached his duty to Northern to conclude that Parsells also breached his duty of care to Puzyk individually, since Puzyk was the "sole owner" of Northern.

In addressing the damage award and requested remittitur, the trial judge found the jury's award of damages was "clearly supported by the evidence," noting plaintiffs "asked for substantially more." The motions for a new trial, JNOV and remittitur were denied.

We are satisfied the court's rulings as to Northern are adequately supported by the substantial, credible evidence contained in the record. Parsells was asked, and agreed, to represent Northern when a conflict arose stemming from Coffey's representation of both Northern and Satec. Puzyk and Parsells

presented sharply conflicting versions of events pertaining to the mediation sessions, the settlement negotiations, and the eventual finalization of the settlement agreement. Angstreich opined that Northern could have obtained a more favorable settlement but for the McElroy defendants' breach of duty to it. Lakind disagreed.

A reasonable jury could conclude from its review of the August 2008 preliminary term sheet that Honeywell was willing to pay Northern at least $250,000, if not the $438,000 desired, to settle their claims. But, in the end, Northern only received $75,000 from Honeywell in the settlement, $13,000 of which was taken by Coffey to pay mediation fees, while Coffey himself received a direct payment of $150,000 from Honeywell, and Satec received $25,000. Based upon the trial testimony, a reasonable jury could conclude that Parsells, a longtime friend of Coffey, pressured Puzyk to settle, failed to look out for Northern's interests, and that his breach of duty to Northern was "a substantial factor in causing" Northern's damages. See Conklin, 145 N.J. at 420; see also 2175 Lemoine Ave., 272 N.J. Super. at 487.

Because reasonable minds could differ as to whether Parsells proximately caused Northern's damages, and also as to the quantum of the damages suffered, the trial court properly denied the motion for judgment. Similarly, the verdict

in Northern's favor is supported by competent evidence and did not constitute a miscarriage of justice. Therefore, there was no error in the denial of the motions for JNOV, remittitur, and a new trial as concerns Northern. The damages awarded to Northern in the amount of $100,000 is not patently excessive or grossly disproportionate. It was substantially less than the $438,000 sought.

We discern no merit to the McElroy defendants' characterization of the damages award, at least in part, as an unlawful disgorgement of Coffey's fee from them. The circumstances here did not just involve Coffey's fee itself, but plaintiffs contended Parsells's negligence resulted in a misallocation of settlement funds which resulted in Coffey receiving substantially more than the contingent fee agreement allowed under the retainer agreement.

Angstreich testified that Parsells should have advised Puzyk and Northern that the $150,000 fee was excessive, and that Coffey was not entitled to it. Even Lakind conceded that, assuming Parsells's representation of Northern continued through finalization of the settlement agreement, he should have addressed the fee issue.

Based upon the evidence in the record, a reasonable jury could conclude that, in his role as counsel for Northern, Parsells had a duty to alert Puzyk that the payment from Honeywell to Coffey far exceeded the agreed-upon amount

A-2104-17T4

for attorney fees. A reasonable jury could conclude that Parsells should have attempted to redirect a portion of Coffey's share to Northern, and that his failure to act accordingly was "a substantial factor in causing" Northern's damages in this regard. See Conklin, 145 N.J. at 420; see also 2175 Lemoine Ave., 272 N.J. Super. at 487. We see no error in the jury's award regarding Northern.

In turning to the McElroy defendants' argument concerning the award to Puzyk individually, we agree the trial court erred in denying the motions for judgment and JNOV. Although there was sufficient evidence to demonstrate the existence of an attorney-client relationship between Puzyk and Parsells, there was no evidence to support a finding that Parsells proximately caused Puzyk, individually, to suffer actual damages independent of the damages incurred by Northern.

"All that is necessary" to establish an attorney-client relationship "is that the parties relate 'to each other generally as attorney and client.'" Petit-Clair v. Nelson, 344 N.J. Super. 538, 543 (App. Div. 2001). In Petit-Clair, we rejected an attorney's contention that he only represented a corporation, and not its husband and wife owners, finding that the parties "related to each other as attorney and client." Id. at 543-44. It was the husband and wife, not the corporation, who relied on the attorney's "guidance and advice." Id. at 544.

A-2104-17T4

Here, it is undisputed that Puzyk was the sole owner of Northern, and that he was the person responsible for accepting or rejecting the settlement on Northern's behalf. Although Angstreich did not opine whether Parsells had an attorney-client relationship with Puzyk individually, Puzyk's own testimony regarding his interactions with Parsells provided sufficient evidence for a reasonable jury to conclude that they related to one another as attorney and client.

However, that relationship was not enough for the jury to award Puzyk damages as an individual. "It is well established that the plaintiff must show a breach of duty and resulting damage to prevail in a negligence action." Nappe, 97 N.J. at 45 (emphasis in original) (citations omitted). "Ordinarily, the issue of proximate cause should be determined by the factfinder," except "in the highly extraordinary case in which reasonable minds could not differ on whether that issue has been established." Fleuhr v. City of Cape May, 159 N.J. 532, 543 (1999) (citations omitted).

Although Angstreich mentioned during his testimony that Puzyk could suffer damages because, under the settlement agreement's terms and the MOA with DEP, he remained personally liable for the remediation of the property if Honeywell failed to complete it, there was no evidence presented that those

circumstances occurred. To the contrary, Puzyk admitted the remediation was completed by Honeywell. Despite the clean-up costs having exceeded the estimates, neither Honeywell nor anyone else had sought any money from him in connection with the remediation. There was no evidence of any breach of the settlement agreement, or that Puzyk had to indemnify Honeywell or Satec, or that he had suffered any consequences at all under the MOA with DEP. Puzyk failed to present evidence he individually sustained any actual monetary loss. Therefore, the potential damages testified to by Angstreich were speculative and not recoverable. See Grunwald, 131 N.J. at 495.

Therefore, the trial court erred when it denied the McElroy defendants' motion for judgment as to Puzyk individually. Since plaintiffs offered no evidence to show that Parsells proximately caused Puzyk to suffer actual damages, the jury's award of $100,000 to Puzyk individually constitutes a miscarriage of justice.

<div align="center">E.</div>

The McElroy defendants contend that the attorney's fee award to plaintiffs was unreasonably high in comparison to their limited recovery at trial. In a cross-appeal, plaintiffs contend the court erred when it failed to award them the full amount of attorney's fees they sought.

Attorney fee determinations by trial courts "will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (citation omitted). "[A] negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred by a former client in prosecuting the legal malpractice action." Saffer v. Willoughby, 143 N.J. 256, 272 (1996). "Those are consequential damages that are proximately related to the malpractice." Ibid.; see Bailey v. Pocaro & Pocaro, 305 N.J. Super. 1, 6 (App. Div. 1997) (explaining that Saffer "dictates that a plaintiff who is economically injured by an attorney's legal deficiency should be made whole" and that "'wholeness' includes the attorney's fees and costs to pursue the malpractice claim.").

Here, the court awarded plaintiffs $47,000 in attorney fees, substantially less than the $87,998 requested. In making its determination, the court properly analyzed the factors under RPC 1.5(a), and concluded the requested fee was "unreasonable and disproportionate to the verdict" and the "modest recovery" awarded. The court reduced the award to $47,000 pursuant to the $12,000 retainer fee and the $35,000 cap on billable hours under the two retainer agreements, reasoning that counsel could not bill an adversary for hours not properly billed to the client.

The court's well-reasoned determination does not constitute a clear abuse of discretion. It was not unreasonable or excessive in light of the amount of the verdict. Moreover, in reducing the award from $87,998 to $47,000, the court considered that plaintiffs sought over $500,000 in damages and recovered substantially less. We discern no abuse of discretion in the attorney's fee award.

In sum, the judgment in favor of Puzyk is vacated and remanded for the entry of an amended judgment. We affirm the remainder of the appeal and dismiss the cross-appeal.

Affirmed in part, vacated in part and remanded in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2104-17T4